## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF CONNECTICUT

LILLIE WASHINGTON,

                    PLAINTIFF

    VS.

CENTRAL CONNECTICUT COAST YMCA,

                    DEFENDANT

CIVIL ACTION
NO. 3:01 CV-1838 (JCH)

DECEMBER 5, 2003

### MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendant seeks summary judgment dismissing the Complaint in this action in its entirety because the undisputed facts establish that Plaintiff cannot prove entitlement to relief on any cause of action she has pled.

### FACTS

Plaintiff Lillie Washington is an African-American woman born February 28, 1951 (Complaint ¶1; Affidavit of Suzanne Friedbacher attached as Exhibit A (hereinafter "Friedbacher Aff.") ¶ 5). She worked for the Defendant Central Connecticut Coast YMCA for a little less than six and one-half years, from sometime in October, 1993 until the effective date of her resignation on March 31, 2000. (Complaint ¶¶ 1 and 2.) She began in child care capacities working in Bridgeport in an after school program. (Deposition of Lillie Washington attached hereto as

Exhibit C (hereinafter "Washington depo"), p.25, l.7 - p.26, l.6; p.36, ll.8-23; p.42, l.18 – p.43, l.10.) Over a few years, she progressed from part-time to full-time positions and moved from program jobs to clerical and administrative duties, providing support for managers who included personnel matters in their multiple responsibilities. (Washington depo p.36, l. 4 – p.44, l.4; Friedbacher Aff. ¶ 7.) One of these managers was an African-American man, Tony Granston. (Washington depo p.38, l.18 – p.39, l.1; Deposition of Helen Breña attached as Exhibit D (hereinafter "Breña depo") p.9, l.16 – p.10, l.10; Friedbacher Aff. ¶ 7.) Mr. Granston resigned voluntarily after suffering some medical problems. (Washington depo p.45, l.13 – p.47, l.2; Breña depo p.10, ll.13-14; Affidavit of Eileen Krause attached as Exhibit E (hereinafter "Krause depo") p.23, ll.12-25.)

After Mr. Granston's departure, the CCCYMCA determined to establish for the first time a manager's position with human resources as its exclusive area of responsibility. (Washington depo p.54, ll.11-17; p.55, ll.10-14; Friedbacher Aff. ¶ 21.) In August, 1998, Ms. Washington assumed this new position, Director of Human Resources. (Washington depo p.45, ll.9-11; Breña depo p.9. ll.3-11; Friedbacher Aff. ¶ 8.) The position reported to Vice President Operations, Helen Breña, a White woman born January 8, 1964. Ms. Breña offered the position to Ms. Washington with the approval of the President, Philip Dwyer, knowing the position would be a significant change in responsibility for Ms. Washington and wishing to give her this advancement opportunity. (Washington depo p.196, ll.2-5; Affidavit of Helen Breña attached at Exhibit B (hereinafter "Breña Aff.") ¶ 6.)

-2-

The CCCYMCA came into existence in 1994 as result of a merger of the Bridgeport and New Haven YMCAs. (Breña depo p.16, ll.6-15.) The combination of the two organizations into one generated "assimilation issues" because the component organizations had each operated somewhat differently from the other. For example, the Bridgeport organization paid generally higher salaries and wages than the New Haven organization. CCCYMCA took steps to equalize the compensation levels for parallel positions that had existed in the two component entities prior to merger. Generally, the change was gradual, with "equity" increases being implemented over several years to bring New Haven-originating positions to levels comparable to Bridgeport-originating positions with similar responsibilities. (Breña depo p.16, ll.2-25.) Neither organization had a dedicated Human Resources position prior to merger. (Washington depo p. 55, ll. 10-14; Breña depo p. 64, ll. 16-23.)

Ms. Washington's pre-promotion pay rate was $13.00 per hour ($27,040 for a 52-week, 40-hour-per-week, year) (Friedbacher Aff. ¶ 7). Her initial salary as Human Resources Director on August 3, 1998 was $35,000 per year. (Washington depo p.48, ll.14-18; Friedbacher Aff. ¶ 8.) As of September 1, 1998, one month into the job, her salary was raised to $40,000 per year. (Washington depo p.66., ll.5-10; Breña depo p.12, ll.7-15; p.62, ll.6-19; Friedbacher Aff. ¶ 9.) All full-time employees performance reviews and any related pay increases were accomplished annually in September in the CCCYMCA's practice at that time. (Washington depo p.100, ll.20-25.) Ms. Washington's good performance in the prior position contributed to the quick and large increase. (Breña depo p. 17, ll.6-8; Freidbacher Aff. ¶ 9 and Exhibit 5 attached thereto.)

At the time Ms. Washington assumed her Human Resources Director position, another person with the word "director" in her title reported to Ms. Breña and was stationed in the CCCYMCA's corporate office. This was the Director of Finance, a White woman named Eileen Krause, born February 11, 1959, paid more than Ms. Washington. (Breña depo p.13, ll.10-12; p.18, ll.13-18; Friedbacher Aff. ¶ 11.)

These two director positions had different qualification requirements, different fiscal responsibility levels, different supervisory responsibilities, different client and Board interaction expectations. They also had different pay levels. (Breña depo p.18, l.24 – p.19, l.2; Breña Aff. ¶ 7.)

During the time Ms. Washington held the Human Resources Director position, her responsibilities were not increased and her title did not change. (Breña Aff. ¶ 8.) The same is not true of Eileen Krause, the Director of Finance.. She moved from Accounting Manager to Finance Director to Chief Financial Officer from 1997 to 2001. Her salary rose with each new role, although not always simultaneously. (Krause depo p.5, l.22 – p.6, l.4; p.9, ll.13-23; p.11, ll.10-15; p.12, ll.2-13; p.33, ll.1-13; Breña depo p.41, l.19 – p.42, l.8.)

Within two months or so of Ms. Washington's becoming Human Resources Director, other CCCYMCA directors and executives attended a National YMCA Directors Conference in Florida. Ms. Washington was not invited to this by Ms. Breña, as she understood White directors had been. (Washington depo p.145, l.12 – p. 147, l.2.) In fact, Ms. Breña had no role in inviting people to the conference, although she approved absence requests and expense reports for attending directors who reported to her, including two African-American women. It was an event

-4-

open only to members of a professional organization YMCA directors may join at their discretion. (Breña Aff. ¶ 14; Friedbacher Aff. ¶ 26.) As she was a director of less than three months tenure at the time, it is not surprising that Ms. Washington did not attend.

During the time she supervised Ms. Washington, Helen Breña's responsibilities were broad and varied. They included supervising several different directors and numerous branches. (Breña depo p. 8, ll. 13-16.) Today, the CCCYMCA includes the following program sites: Alpha Community Services, Bridgeport YMCA, Fairfield YMCA, Hamden/North Haven YMCA, Lakewood-Trumbull YMCA, Milford/Orange YMCA, New Haven Youth Center, Ralphola Taylor Community Center, Sound View Family YMCA, Stratford YMCA, YMCA Camp Hi Rock, Camp Mountain Laurel, Crescent Apartments, Fairfield Apartments, Families-In-Transition, Family Program Center, Harding High School Resource Center, Harrison Apartments, PALS I, II & III Child Care Centers, Program Center, Southend Community Center (Bridgeport), Southend Community Center (Stratford), Southern Berkshire Youth Association, and West Village Apartments. (Some of these have come into existence or become affiliated with Defendant since the time Ms. Washington left the CCCYMCA's employ.) Generally, each of these sites has a separate Board, a different site administrator, potentially multiple program directors, service delivery employees and clerical and maintenance staff. Each of these facilities receives administrative services from the headquarters staff in New Haven in areas of development, finance and human resources. The New Haven headquarters staff also collect and manipulate program service and financial data to support the program branches in securing, complying with and implementing grants and other funding sources. (Friedbacher Aff. ¶ 10.)

-5-

To provide these services effectively, some headquarters staff were required to visit branches. This was certainly true of Ms. Washington's Human Resources job. (Washington depo p.188, l.22 – p.189, l.2; Breña depo p.32, l.14 – p.33, l.24.) Ms. Breña, too, as the executive with supervisory responsibility over branch administrators, spent much time out of the headquarters office, visiting branches to do her job. (Breña Aff. ¶ 9.)

Ms. Breña often does things that are actually within the responsibilities of others, like authorizing personnel actions, directing staff more than an organizational tier below her. (Breña depo p.37, l.22 – p.38, l.24.) She does this to get things done, to lighten the load on her reports and to avoid delay. (Breña depo p.39, ll.1-17.) Her doing this is sometimes an annoyance to her direct reports who might prefer to do these tasks themselves or to have an opportunity to consider or discuss whether, when and how a task is accomplished.

Ms. Breña's performance of tasks she also could have done forms a significant basis of Ms. Washington's complaint. (Washington depo p.121, l.6 – p.127, l.13; p.128, l.24 – p.129 – l.24; Krause depo p.21, ll.6-16.) However, other people reporting to Ms. Breña also had this experience. Ms. Krause, the Finance Director, for example, was displeased when Ms. Breña assigned one of Ms. Krause's direct reports to perform training in point of contact electronic record creation without Ms. Krause's advance knowledge. (Krause depo p. 21, ll. 6-16.)

Ms. Breña works a demanding job with a grueling schedule, fitting in meetings and other communications as she can while keeping abreast of the activities of nine different branches and the headquarters functions she oversees. (Breña depo p.8, ll.13-16.) She sometimes addresses coworkers and reports without niceties. Indeed she can be blunt. Ms. Washington found Ms.

-6-

Breña's tone disturbing in many of their communications toward the end of her employment. (Washington depo p.110, ll.14 – p.112, l.8.)  However, Ms. Breña and Ms. Krause have also engaged in raised voice exchanges.  (Krause depo p.20, ll.3-17; p.21, ll.14-23.)

Ms. Breña disagreed with Ms. Washington about her interpretation of a human resources policy in the presence of other staff on one occasion.  A number of employees, including Ms. Washington and Ms. Breña, were gathered in a common area at CCCYMCA headquarters to celebrate a coworker's birthday with a cake.  At the instigation of another employee, Ms. Breña revealed that her view of a specific human resources question differed from Ms. Washington's. (Washington depo p.127, l.14 – p.128, l.23; Breña depo p.22, l.12 – p.23, l.8.)

In the Fall of 1999, Ms. Breña noticed an entry she did not understand on Ms. Washington's time sheet.  Ms. Washington's time sheet showed "bereavement leave" and vacation leave.  Ms. Breña asked Ms. Washington what was meant by those entries and Ms. Washington explained that her brother had died when she was already scheduled to be on vacation.  Ms. Breña stated she hadn't known Ms. Washington planned to be on vacation.  Ms. Washington reminded her that she had approved it some time earlier and Ms. Breña agreed it must have been so after looking at her own calendar and noting it was so marked.  Ms. Breña was able to process the time report correctly after understanding it.  (Washington depo p.105, l.11 – p.112, l.8; Breña Aff. ¶ 10.)

Ms. Breña received comments and inquiries from branch executives about their inability to reach Ms. Washington for advice on time-sensitive matters on some occasions.  Knowing Ms. Washington's duties required her to travel among the branches, Ms. Breña asked Ms. Washington

-7-

to make sure headquarters personnel were aware of her planned location so that she could be reached for consultation whenever required. (Breña depo p. 28, l. 25 – p. 34, l. 17; Washington depo p. 113, l. 11 – p. 114, l. 17; p. 188, l. 15 – p. 190, l. 24.)

Ms. Breña received several complaints about the unclarity of written communications generated by both the Director of Finance, Ms. Krause, and the Director of Human Resources, Ms. Washington. As a result, Ms. Breña instructed both women to give her an opportunity to review and help edit all written communications before they were sent out. (Breña depo p. 28, ll. 4-24; Krause depo p. 27, l. 23 – p. 28, l. 23; Washington depo p. 187, l. 8 – p. 188, l. 5.)

In 1999, Ms. Breña reviewed Ms. Washington's performance favorably, although noting some improvement needs, and recommended a salary increase. (Friedbacher Aff. ¶ 12 and Exhibit 6 attached thereto.) When the two met to discuss the review in September, Ms. Washington expressed her dissatisfaction and told Ms. Breña she thought she deserved a higher merit-based increase[1] and an additional increase to bring her salary to the same level as the Finance Director's. (Washington depo p.74, l.2 – p.75, l.6; p.161, l.19 – p.162, l.14; Breña depo p.39, l.22 – p.40, l.7; p.63, ll.9-18.) Ms. Breña disagreed and explained the basis for her merit rating judgments about Ms. Washington's performance and the differing job content elements that

---

[1] This was not the only experience Ms. Breña had of an employee she supervised disagreeing with her assessment of the subordinate's performance. In 2001, for example, Suzanne Friedbacher, who is now CCCYMCA's Human Resources Director, was serving as the Hamden/North Haven branch executive. She was displeased with Ms. Breña's review and merit rating of her performance and pursued this disagreement with written argument. Ms. Breña was fully aware of Ms. Friedbacher's criticism of her when she participated in her selection as the Human Resources Director. (Friedbacher Aff. ¶ 16.)

underlay the difference in the salary rates for the two positions. Later Ms. Breña did review the salary placement of the Director Human Resources position. In the meantime, however, Ms. Breña instructed Ms. Washington to have the increase Ms. Breña had approved processed. (Washington depo p.165, ll.20-23.)

Ms. Washington identified this as the point where problems began for her in her CCCYMCA employment.   See CCHRO Affidavit, Exhibit 10 to Friedbacher Aff. ¶ 18; Washington Depo p.114, l.18 – p.117, l.25.

Ms. Washington alleges that Ms. Breña demanded that she report how she spent her time on a daily basis after their discussion of her performance review in September 1999, but she never complied. (Washington depo p.112, l.13 – p.114, l.7.)

Some weeks after their performance review meeting, in the early part of 2000, Ms. Breña noticed in reviewing some financial information that Ms. Washington was still being paid at the salary rate in effect before her most recent performance review and merit increase.   On investigation, Ms. Breña learned that the required form had not been forwarded to the payroll staff by Ms. Washington.  In addition, having gone to Ms. Washington's personnel file in the course of this investigation, Ms. Breña learned for the first time that Ms. Washington had prepared a written response to her performance review and placed it in her own personnel file without copying or even notifying her supervisor.  (Washington depo p.164, l.9 – p.165, l.6; Breña depo p.25, ll.4-9; p.44, ll.3-16; Friedbacher Aff. ¶ 12 and Exhibit 6 attached thereto.)

Ms. Breña questioned Ms. Washington, who confirmed that because she felt her merit increase was inadequate, she would not accept it and therefore did not follow Ms. Breña's

-9-

instruction to process the paperwork to payroll. (Washington depo p.165, l.20 – p.168, l.4.) Ms. Washington also confirmed that she had written a response to her performance review to record her disagreement and placed it in her file without giving it to Ms. Breña or Ms. Breña's boss, the CEO, Mr. Dwyer, or indeed, anyone at all. (Washington depo p.171, ll.17–25; p.164, l.14 – p.165, l.6.) Ms. Washington maintained that she had the right to do so and had no obligation to alert her own management. (Washington depo p. 169, l. 25 – p. 175, l. 10.) Ms. Breña told Ms. Washington that this was not acceptable and instructed her specifically not to place anything in her personnel file without sharing it with Ms. Breña. (Washington depo p. 190, l. 25 – p. 192, l. 6; Breña depo p. 44, l. 17 – p. 45, l. 14.)

Ms. Breña did look into Ms. Washington's salary complaint. She checked the YMCA of the USA's job analysis model to verify the position's salary grade designation and informally surveyed Human Resources positions in area non-profit organizations to verify Ms. Washington's placement on the range for that grade. These efforts persuaded Ms. Breña that the job was in the right salary grade and Ms. Washington was at the right point in that salary grade. She so informed Ms. Washington. (Washington depo p.168, ll.13-25; Breña depo p.40, l.22 – p.41, l.3; p.43, l.20 – p.44, l.2; p.64, ll.16-23.)

Ms. Breña confirmed her disappointment in Ms. Washington's actions in a memo to Ms. Washington. (Friedbacher Aff. ¶ 13 and Exhibit 7 attached thereto.) At or about the same time, Ms. Breña advised Ms. Washington that she and other employees were confused as to why Ms. Washington had sent them new insurance cards. (Washington depo p.133, l.3 – p.135, l.8; Breña depo p.24, l.4 – p.25, l.16.) Ms. Washington responded with a written resignation dated February

16, 2000, which she left on Ms. Breña's desk, stating her last day of work would be March 31, 2000. (Friedbacher Aff. ¶ 14.) The resignation letter states the primary reason is Ms. Washington's unwillingness to comply with Ms. Breña's demand to see all her additions to her personnel file. (Washington depo p. 198, l. 25 – p. 199, l. 23; p. 200, l. 13 – p. 201, l. 15.)

Ms. Breña determined to accept the resignation. (Breña depo p.36, ll.12-16.) Ms. Washington worked out her approximately six-week notice period and left the CCCYMCA at the end of March, 2000. (Friedbacher Aff. ¶ 14.) Before she left, Ms. Washington discussed her resignation reasons with Mr. Dwyer, the CCCYMCA's Chief Executive Officer. (Washington depo p.203, ll.21-24.)

At the time of her resignation, Ms. Washington was enrolled in a Human Resources Management Certificate Program at Fairfield University's School of Continuing Education that required attendance two nights per week for three hours each night for a full academic year (approximately September to June). (Washington depo p.34, l.22 – p.36, l.3.) The CCCYMCA had encouraged Ms. Washington's enrollment in this course in 1999 and agreed to pay the $1,654 tuition costs. Despite Ms. Washington's resignation, CCCYMCA did not demand repayment or interfere with her completion of the course. (Breña Aff. ¶ 11.)

Ms. Washington never told CCCYMCA's management that she believed her race, color or age was a factor in what she believed were adverse decisions made about her prior to submitting her resignation. (Washington depo p.203, l.10 – p.204, l.25.) CCCYMCA's employee handbook describes a grievance procedure giving employees the opportunity to pursue resolution of problems to the Chief Executive Officer level and , at the CEO's discretion to a specially

-11-

appointed panel. (Friedbacher Aff. 17; Washington depo p.203, l.25 – p.204, l.21.) Ms. Washington did not avail herself of it although she acknowledges that it is an appropriate vehicle for resolving concerns about employment discrimination. (Washington depo p.203, l.25 – p.205, l.18.)

On September 7, 2000, about six months after leaving the employ of the CCCYMCA, Ms. Washington filed with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") a complaint of race and color discrimination. The complaint alleged discrimination in compensation as of September, 1999, in harassment from November, 1999 onward and in her constructive discharge on March 31, 2000. (Friedbacher Aff. ¶ 18.) The CHRO dismissed the complaint on January 11, 2001 because its Merit Assessment Review concluded that further investigation would not result in a finding of reasonable cause. (Friedbacher Aff. ¶ 19.) EEOC adopted CHRO's dismissal and issued a Notice of Right to Sue on April 9, 2001. (Friedbacher Aff. ¶ 20.) Ms. Washington commenced this action by serving it on the Defendant prior to filing in Connecticut Superior Court from whence Defendant removed the case to this Court. Service occurred on August 27, 2001, 140 days after issuance of the Notice of Right to Sue.

Immediately after Ms. Washington's resignation, CCCYMCA's human resources responsibilities were handled by Ms. Breña and people to whom she delegated. (Breña Aff. ¶ 12.) Thereafter, the idea of a dedicated human resources executive position was again pursued, but with a broader and deeper array of responsibilities than Ms. Washington's job had and a reporting relationship directly to the CEO. (Friedbacher Aff. ¶ 21.) As reconceived, the Human Resources

-12-

Director position now had responsibility for staff development, salary administration plans, development and administration of training plans, preparation and monitoring of staff development budget, establishment of training and certification standards and goals, promotion of staff for certification as trainers and ensure training, coordination of recruitment efforts, supervision of payroll staff, and orientation for new hires. (Compare Friedbacher Aff. Exhibits 4 and 9.) In May 2001, over a year after Ms. Washington departed the CCCYMCA's employ, an internal and external search concluded with the appointment of Suzanne Friedbacher, a White woman born March 23, 1953, with a salary of $63,690. (Friedbacher Aff. ¶ 2.) Ms. Friedbacher had worked in the CCCYMCA and its New Haven pre-merger predecessor for ten years and with other YMCA organizations for another eight years, when she assumed this role. She brought to the job her educational achievements of a Bachelor of Science and Master of Education degrees. Her per year at the time of her appointment to the position. (Friedbacher Aff. ¶¶ 22-24.)

## ARGUMENT

I.     Legal Standard Applicable

A motion for summary judgment should be granted where the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P.56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The burden of showing that no genuine factual dispute exists rest on the party seeking summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The movant, however, is not required to make an affirmative showing that there are no material facts in issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), cert.

-13-

denied, 484 U.S. 1066 (1988). Instead, the movant has to show only "an absence of evidence to support the nonmoving party's case." Id.

The substantive law governing the case identifies those facts that are material on a motion for summary judgment. See Anderson, 477 U.S. at 258. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation and internal quotation marks omitted). A dispute regarding a material fact is genuine only where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.), cert. denied, 506 U.S. 965 (1992) (internal quotation marks and citation omitted).

II.     Ms. Washington's Age Discrimination Claim Must Fail

Plaintiff's Complaint alleges age discrimination only in its first paragraph (which is incorporated in the Second and Third Counts) in this language: "The plaintiff, Lillie Washington, brings this action for employment discrimination on the basis of race, color and age." The Complaint nowhere alleges the actual, approximate or comparative ages of any individuals, including Plaintiff.

The Complaint is comprised of three counts, for violation of 42 USC § 1981, for violation of Title VII of the Civil Rights Act, 42 USC § 2000e et seq, and for "Emotional Distress," none of which could support a claim of age discrimination.

A.     42 USC § 1981 Does Not Prohibit Age Discrimination

-14-

Plaintiff's First Count alleges that her treatment as an employee of the CCCYMCA violated 42 USC § 1981. This statute provides in pertinent part

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

It has long been held that this statute is available to prosecute claims of race and alienage discrimination only. Age discrimination cannot be fit under the narrow focus of this statute. Kodish v. United Air Lines, Inc., 628 F.2d 1301 (10th Cir. 1980); Laird v. Texas Commerce Bank-Odessa, 707 F. Supp. 938 (W.D. Texas 1988); Johnson v. United Airlines, Inc., 680 F. Supp. 1425 (D. Hawaii 1987); Boddorff v. Publicker Industries, Inc., 488 F. Supp. 1107 (E.D. Pa. 1980).

### B.     Title VII Does Not Prohibit Age Discrimination

Plaintiff's Second Count purports to state a claim under Title VII, apparently further referenced in item 1 of the prayer for relief as 42 USC § 2000e.

Title VII of the Civil Rights Act of 1964 prohibits race, color, religion, national origin and sex discrimination:

> It shall be an unlawful employment practice for an employer -
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .

-15-

42 U.S.C. § 2000e-2(a). Title VII is not a proper vehicle for an age discrimination claim.

C.    Plaintiff Has Failed to Satisfy Administrative Prerequisites to Pursuing Age Discrimination Claims Through Litigation

Claims of age discrimination in employment can be pursued under the Americans With Disabilities Act, 29 U.S.C. § 623, et seq. and Connecticut's Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq. Both these statutes prescribe administrative processes that must be followed as a condition precedent to litigation with the purpose of encouraging speedy, efficient resolution of complaints. Employment age discrimination complaints must be filed with the Equal Employment Opportunity Commission and the State fair employment practices agency (here, the CHRO) prior to commencement of suit under the ADEA, Burrowes v. Brookdale Hosp. and Medical Center, 2003 WL 1240609 (2d Cir. 2003); Sullivan v. Board of Police Commissioners of City of Waterbury, 196 Conn. 208 (1985), and before the CHRO prior to suit under the State statute, Sullivan, supra. While Plaintiff here filed with both agencies, she alleged no age discrimination when she did so. (Friedbacher Aff. ¶ 18 and Exhibit 10 attached thereto.) Thus, her age discrimination claim should be dismissed.

D.    The Undisputed Facts Cannot Support a Claim of Age Discrimination

Age discrimination in employment claims depend on evidence that adverse employment action was motivated by the Plaintiff's age (40 or over in the case of the federal statute). The absence of adverse employment action and the fact that the identical actor responsible for conferring employment advantages on Plaintiff is identified as the intentional

-16-

harm inflictor are fatal to age and other discrimination claims.  Wanamaker v. Columbian Rope Co., 108 F.3d 462 (2d Cir. 1997); Banks v. Travelers Companies, 180 F.3d 358, 366 (2d Cir. 1999).

III.   **Plaintiff Has Failed To Satisfy The Administrative Prerequisites To Suit Under Title VII**

Plaintiff filed a complaint of race discrimination with CHRO on September 7, 2000. The Complaint was dismissed on January 11, 2001.  EEOC adopted CHRO's determination and issued a Notice of Right To Sue on April 9, 2001.  Plaintiff was required to bring a civil action in court within 90 days after receiving the Notice, presumably a few days after its issuance, 42 USC § 2000e-5(f)(1).  Ninety days after April 9, 2001 was July 8, 2001. Therefore, one would have expected suit to have been initiated not later than mid-July. Plaintiff did not commence suit until August 27, 2001 when service was completed on Defendant,[2] 140 days after the Notice issued.  If Plaintiff cannot show it took her 50 days to receive the EEOC's Notice, her claim under Title VII should be dismissed.

IV.   **Plaintiff's Employment Experience At CCCYMCA Was Not Infected With Unlawful Race Discrimination**

A.   **The Elements of A Claim of Race Discrimination In Employment Under Title VII and 42 USC § 1981 Are The Same**

Plaintiff's Complaint invokes two different statutory provisions to assert her claims of race and color discrimination:  Title VII of the Civil Rights Act of 1964, 42 USC § 2000e, et

_____

[2]   Under Conn. Gen. Stat. 52-45a, suit is commenced by process in Connecticut Superior Court, where this action was filed and thence removed thereafter.

-17-

seq. and a Reconstruction Era Civil Rights statute guaranteeing all persons contract rights equal to those of white citizens, 42 USC § 1981.

As noted above, Plaintiff has failed to satisfy the procedural requirements of suit under Title VII. Her claim under 42 USC § 1981 is not limited by these constraints.

Under either statute, however, the claim cannot stand because the facts do not support the identical substantive elements required. Tadros v. Coleman, 717 F. Supp. 996 (S.D.N.Y. 1989), cert. denied, 498 U.S. 869 (1990). These elements are: membership in a protected class, qualification for the position in question, an adverse employment action taken by the defendant and some evidence of a racially discriminatory motive for the action. Terry v. Ashcroft, 92 Fair Empl. Prac. Cas. (BNA) 447 (2d Cir. 2003).

B.    Plaintiff Did Not Suffer A Racially Hostile Environment

1.    The Treatment Plaintiff Cites Is Not Objectively Offensive Or Sufficient To Constitute A Change in the Terms and Conditions of Employment

To support her claim of a hostile environment actionable as an adverse employment action under Title VII, Plaintiff must prove treatment rising to the level of affecting a term or condition of employment. Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993). Isolated annoyances do not establish such a claim. Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310 (2d Cir. 1999). Rather , the severity and/or frequency of the conduct must be high to meet this standard. Richardson v. New York State Dept. of Correctional Service, 180 F.3d 426 (2d Cir. 1999). Moreover, Plaintiff must prove not only her own subjective actual

offense taken to the offending conditions, but also that a reasonable person would <u>objectively</u> find them so. <u>Harris, supra.</u>

Plaintiff cites (1) being asked to report her activities daily, (2) being questioned about a single weekly time sheet, (3) being asked to submit her written communications for pre-distribution supervisory review, (4) being criticized by her supervisor on her work performance in harsh tone and terms on at most seven occasions over a period of five months, (5) being contradicted on a human resources question by her supervisor once in the presence of coworkers, (6) being preempted from performing some of her duties by her supervisor's performing them, (7) being instructed not to add to her own personnel file without notifying her supervisor, and (8) being called "stupid" by her supervisor once.

(1)    Plaintiff told her supervisor the demands on her were unreasonable and her pay was too low when they discussed her review in September 1999. Shortly thereafter, her supervisor asked her to account for her work activity daily. She never complied and suffered no consequences. This is simply not objectively offensive and only extreme sensitivity unprotected by this nation's anti-discrimination laws could have made it so to Plaintiff. Vague "feelings" of discomfort by a minority employee cannot support a hostile environment claim. <u>Williams v. County of Westchester</u>, 171 F.3d 98, 101 (2d Cir. 1999).

(2)    Ms. Washington's time sheet being questioned on one occasion when her supervisor did not recall a vacation having been approved is another non-event to which she overreacts. Again, this is not the kind of behavior a reasonable person would interpret as an adverse employment action. This is the normal give and take of being employed. <u>Id.</u>

-19-

(3)    Submitting written communication to a supervisor's review prior to distribution is not an outrageous demand in a workplace. Misplaced pride and suspicion alone can qualify it as a poison to the workplace environment. Id.

(4)    Negative criticism is an unpleasant but commonplace aspect of doing a job for a boss. Particularly since Plaintiff was taking on a newly created position and assuming a much higher level of responsibility than she previously exercised, correction by her supervisor should have been expected and accepted. Broughton v. Connecticut Student Loan Foundation, 64 F. Supp. 2d 64 (D. Conn. 1999). According to Ms. Washington, it was, until Ms. Breña refused to give her more than a 6% increase after her first full year on the job.

(5)    Plaintiff's disagreement with her supervisor on a policy matter was unfortunately made "public" by a coworker at a birthday celebration. This was embarrassing to, not the act of, Plaintiff's supervisor. Rhodes v. Conde Nast Publications, Inc., 6 Fed. App. 74 (2d Cir. 2001) (two verbal beratings by supervisor and another's public humiliation and hit on shoulder not enough to establish hostile environment.)

(6)    It is almost hard to take seriously Plaintiff's complaint that her supervisor harmed her by signing off on personnel transaction forms and payroll sheets. Most subordinates would be grateful for such a lightening of their load by their bosses. In the context of this motion, of course, implications most favorable to the Plaintiff must be assumed. Therefore, assume that Ms. Breña's performance of actions Ms. Washington could also have performed impeded Ms. Washington's efforts to establish her own and her position's authority in the organization. Even so, this aspect of their relationship cannot be

-20-

more than an annoyance or a difference of opinion, not the stuff out of which federal cases are made!

(7)    The instruction to let Ms. Breña see what she was putting in her own personnel file can be characterized as the straw that broke the camel's back for Ms. Washington. Though she never told her supervisor so, Ms. Washington testified she felt this demanded inappropriate disclosure of medical information about herself and her daughters. (Washington depo p.190, l.25 – p.192, l.24; p.199, ll.2-23; p.200, ll.25 – p.201, l.23.) Paradoxically, Ms. Washington acknowledges that Ms. Breña had access to all the Defendant's files. (Washington depo p.220, ll.1-2.)  Moreover, Ms. Washington knew Connecticut law required separate maintenance and more limited access to medical files than personnel files (Washington depo p.191, ll.14-21.)  Finally, Ms. Washington did not explain this concern to Ms. Breña, who was responding to Ms. Washington's "secret" rebuttal to her performance evaluation when she gave the instruction.  (Washington depo p.199, ll.2-23; p.202, ll.9-20.)  Ms. Washington has consistently taken the position that she was perfectly privileged to make her or any employee's rebuttal of a supervisor's performance evaluation part of the file without letting the supervisor see it.  (Washington depo p.172, l.16 – p.174, l.20.)

(8)    Plaintiff claims Ms. Breña called her "stupid" on one occasion, Ms. Breña denies it.  Ms. Washington's sworn testimony on the incident shows she heard Ms. Breña utter the word after Ms. Washington had left Breña's office and interpreted it to be directed at her.  Even assuming that this interpretation was accurate, this does not rise to the level of

-21-

affecting a term or condition of employment.  Thicker skin than this must be worn in the workplace.  <u>Lopez v. S.B. Thomas, Inc.</u>, 831 F.2d 1184 (2d Cir. 1987), <u>overruled on other grounds by</u>, <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164 (1989) (degrading and lewd obscenities too few in number and in short time period to create hostile environment).  "Not everything that makes an employee unhappy is an actionable adverse action."  <u>Gaynor v. Martin</u>, 77 F. Supp. 2d 272, 278 (D. Conn. 1999) (internal citations omitted).

Isolated incidents in themselves not actionable can, in combination, create a hostile environment sufficient to adversely affect a term or condition of employment.  <u>Harris v. Forklift Systems</u>, <u>supra</u>.  This, however, is not such a case.  Rather, Ms. Washington paints an even less damaging picture than the plaintiff in <u>Hill v. Pinkerton Sec. & Investigation Services, Inc.</u>, 977 F. Supp. 148 (D. Conn. 1997), who failed to establish a racially or sexually hostile environment with allegations that her employer first falsely denied and later mischaracterized pay differentials, unjustifiably complained about her work performance, changed her long-term location assignment and her lunch break schedule.  <u>See also</u>, <u>Lopez v. S. B. Thomas, Inc.</u>, 831 F.2d 1184, 1189-90 (2d Cir. 1987) (harassment of employee of Puerto Rican descent several times over short period of time insufficient).

       2.     <u>The Supervisory Action Plaintiff Challenged Was Equally Applied To White Coworkers and Could Not Have Been Racially Discriminatory</u>

Other persons reporting to Ms. Breña experienced her performing their own responsibilities.

Ms. Krause also had occasion to be displeased by Ms. Breña's actions circumventing Ms. Krause's authority. For example, Ms. Breña assigned an employee reporting to Ms. Krause to attend training without asking or notifying Ms. Krause. Ms. Breña asked Ms. Krause to submit <u>her</u> writing for pre-dissemination review because of complaints about their unclarity. Ms. Breña raised her voice and was less than polite in some of her workplace communications with Ms. Krause.

Ms. Friedbacher, who reported to Ms. Breña as a branch executive prior to her appointment as Human Resources Director, took exception to several of Ms. Breña's decisions about her performance evaluation and the comments she sent Ms. Breña became part of her file. (Friedbacher Aff. ¶ 16.)

Ms. Friedbacher and Ms. Krause are White. .

The critical issue in a discriminatory hostile environment claim is whether one group is subject to more disadvantageous conditions than the other. <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75 (1998). Obviously, when the same steps are taken to encourage the improved performance of white employees and black employees, there is no indication of race discrimination. <u>Brennan v. Metropolitan Opera Association, Inc.</u>, 192 F.3d 310, 318 2d Cir. 1999).

C.  <u>Ms. Breña Was the Plaintiff's Benefactor as Well as The Author of What Plaintiff Characterizes as adverse.</u>

Ms. Breña got Ms. Washington the job as Human Resources Director. Ms. Breña got Ms. Washington the huge raise she received in 1998. Ms. Breña approved Ms.

-23-

Washington's enrollment in the Fairfield University Human Resources Administration course. Ms. Breña never warned or disciplined Ms. Washington formally. Ms. Breña gave Ms. Washington a favorable review (though not as good as what Ms. Washington believed she deserved) in 1999. Ms. Breña recommended her for a significant raise in 1999. When the same actor is the author of favorable and adverse employment actions towards an employee, it is illogical to conclude that animus against the person's immutable characteristics infects the decision maker's motivation. Banks v. Travelers Companies, 180 F.3d 358, 366 (2d Cir. 1999).

### D. Plaintiff's Compensation Was Appropriate And Not Depressed For Racial Motivations

Plaintiff claims that the 29.43% , 14.28% and 6% increases in her salary that she received in 1998 and 1999 on being promoted to the Human Resources Director position and completing a full year of performing in it were insufficient and her salary was too low as a result of race discrimination. These claims lack legal merit and logic!

Plaintiff argues that because her title included the word "director" and her immediate supervisor was Ms. Breña and because these things were also true of the White Director of Finance, Eileen Krause, their salaries should have been identical. The thinness of this argument, blatant enough on its face, is absolutely proven to be inadequate to support a claim of race discrimination by a closer look at the facts.

The comparison of Plaintiff's duties to those of her chosen comparitor, Ms. Krause are significant. The additional supervision, fiscal responsibility, reporting and board

communication roles present in the Finance job but absent from the Human Resources job are perfectly legitimate nondiscriminatory business reasons for differences in compensation. Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1363 (10th Cir. 1997); Hill v. Pinkerton Sec. & Investigation Services, Inc., 977 F. Supp. 148 (D. Conn. 1997).

Another fact that explains the difference between Ms. Krause's pay and Ms. Washington's is the contrast in their educational attainments, Ms. Krause having bachelor's and masters degrees and Ms. Washington only an associates degree. (Friedbacher Aff. ¶ 25 and Exhibit 13 attached thereto, and Exhibit F attached to this memorandum, a document produced by Ms. Washington in discovery.)

The compensation difference between these individuals is further justified by the distinctions between the business or work experience each party brought to the defendant's employ. CCHRO v. Torrington, 2002 WL 1293315*3 (Conn. Super. 2002). Ms. Krause had years of full-time employment in finance area jobs of increasing responsibility. Ms. Washington had less than ten years of work experience, two in supervising a single health aide in a small elder care facility that failed fiscally and the remainder in part-time and full-time child care and clerical support positions. That these years were in the CCCYMCA's employ was worthy of recognition and it received that. In fact, it is most probably this factor that prompted Ms. Washington's placement as the Human Resources Director at all. To propose, however, as Plaintiff does, that length of service with an employer, regardless of position, requires equal or higher compensation than shorter tenure is preposterous.

-25-

Plaintiff also argues the higher pay of the current Human Resources Director, who is White proves that her own pay was depressed for racially discriminatory reasons. This is equally mistaken. The difference in pay rates traces directly to differences in responsibility. The current Human Resources Director handles payroll and budget planning, has an expanded role in Board reporting and supervises an increased staff.   In addition, a comparison of Ms. Friedbacher's and Ms. Washington's education and work experience qualifications gives ample additional basis for the difference in their compensation.

Plaintiff also argues that Ms. Breña's review of the position's salary is itself evidence of discrimination because Ms. Breña did not submit Ms. Krause's or anyone else's compensation to similar review.  The short answer to this issue, of course, is that no one else asked for such a review.  Ms. Washington alone among the headquarters staff suggested that her pay was set too low.  Since it was a new position and because of Ms. Washington's concern, Ms. Breña took the logical step of having the job analyzed under the salary setting protocol of the YMCA of the USA, which confirmed the job's placement in the salary grade the CCCYMCA had selected for it.  Since the salary grade spans a large spread of salary levels and Ms. Washington's was not at the top while other CCCYMCA positions in that grade were paid higher, Ms. Breña also considered the local market rates for human resources positions with nonprofit entities.  These efforts did not change, but rather confirmed, the salary set for Ms. Washington.  (Breña depo p.40, l 22 – p.41, l.3; p.43, l.20 – p.44, l.2; p.64, ll.16-23.)

Ms. Washington also argues that equity pay adjustments were routinely made without research at CCCYMCA. The only reference CCCYMCA has been able to identify to which Ms. Washington might be referring are adjustments made in the years following the Bridgeport/New Haven merger to render more equivalent the compensation for people doing the same or similar jobs in different locations, including one child care center with a staff paid below others. These examples involve positions that existed in both the Bridgeport and New Haven organizations prior to merger that were held by White people and Black people. For example, child care workers in one branch were given raises in short order to bring them up to the level then current for other such workers. (Washington depo p.104, ll.1-12; Breña Aff. ¶ 13.) Ms. Washington's position, however, had no counterpart in either predecessor organization and so no regional inequity to be corrected. It is not an apt comparison because the employees Ms. Washington cites as being treated differently than she was are not similarly situated to her. Nor could she identify them as being racially different from her. (Washington depo p.186, l.11 – p. 187, l.7.)

E.    Plaintiff's Voluntary Resignation Was Not A Constructive Discharge

After about 18 months in the Human Resources Director position, having experienced disagreement, with, and corrective admonitions from, her supervisor, Lillie Washington decided to resign. She did so giving as her primary reason the insult she felt at the requirement that she show supervision her additions to the personnel file CCCYMCA maintained on her. She asserted that dealing with her supervisor was intolerable and her pay was too low.