UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LILLIE WASHINGTON,<br><br>                PLAINTIFF,<br><br>VS.<br><br>CENTRAL CONNECTICUT COAST YMCA,<br><br>                DEFENDANT. | CIVIL ACTION<br>NO. 3:01 CV-1838 (MRK)<br><br><br><br><br><br>DECEMBER 5, 2003 |

**DEFENDANT'S LOCAL RULE 56(a)1 STATEMENT**

1. Plaintiff is an African-American female. (Complaint ¶ 1)

2. At all relevant times, Defendant employed more than 15 employees. (Complaint ¶ 5)

3. At all relevant times, Defendant did business in the State of Connecticut. (Complaint ¶ 6)

4. Plaintiff began working for Defendant on or about October 12, 1993, in an after school program. (Affidavit of Suzanne Friedbacher ¶ 6 and Exhibit 1 attached thereto; Deposition of Lillie Washington p. 25, ll.9-12; p.36, ll. 8-15)

5. On May 26, 1998, Plaintiff became Human Resources Assistant and reported to Tony Granston, a Black African American. In this position, Plaintiff was paid $13.00 per hour. (Affidavit of Suzanne Friedbacher ¶ 7 and Exhibit 2 attached thereto; Deposition of Lillie Washington p.38, 1.18 – p.29, 1.1)

6. Tony Granston had other responsibilities in addition to his personnel function. (Deposition of Lillie Washington p.54, ll.15-21)

7. When Tony Granston resigned, Plaintiff was promoted to Director of Human Resources on August 3, 1998. (Deposition of Lillie Washington p.45, ll.9-11; Affidavit of Suzanne Friedbacher ¶ 8 and Exhibits 3 and 4 attached thereto)

8. Plaintiff was offered the position of Director of Human Resources by Helen Breña. (Deposition of Lillie Washington p.48, ll.4-7; Helen Breña Affidavit ¶ 6)

9. Director of Human Resources was a newly created position when Plaintiff was offered and accepted it. (Deposition of Lillie Washington p.54, ll.11-17; Deposition of Helen Breña p.9, ll. 3-11; Affidavit of Helen Breña ¶ 5)

10. CCCYMCA came into existence in 1994 as result of a merger of the Bridgeport and New Haven YMCAs. (Deposition of Helen Breña p.16, ll.6-15)

11. CCCYMCA took steps to equalize the compensation levels for parallel positions that had existed in the two component entities prior to merger. "Equity" increases were implemented over several years to bring New Haven-originating positions to levels comparable to Bridgeport-originating positions with similar responsibilities. (Deposition of Helen Breña p.16, ll.2-25)

12. When Plaintiff accepted the position of Human Resources Director, she was compensated at an annual rate of $35,000. (Deposition of Lillie Washington p.48, ll.14-18; Affidavit of Suzanne Friedbacher ¶ 8 and Exhibits 3 and 4 attached thereto)

13. Plaintiff was not paid the same salary as other Directors. (Complaint ¶ 9)

14. On September 1, 1998, Plaintiff's salary was raised from $35,000 to $40,000 per year. (Deposition of Lillie Washington p.65, l.2 – p.66, l.10; Affidavit of Suzanne Friedbacher ¶ 9 and Exhibit 5 attached thereto)

15. During Ms. Washington's tenure, it was CCCYMCA's policy to conduct employee performance reviews for full-time employees annually in September. (Deposition of Lillie Washington p.100, ll.20-25)

16. When Ms. Washington assumed the Director of Human Resources position in August 1998, the Director of Finance position was held by a White woman named Eileen Krause born February 11, 1959 and paid more than Ms. Washington (Breña depo p.13, ll.10-12; p.18, ll.13-18; Friedbacher Aff. ¶ 11).

17. The two director positions referenced in paragraph 16 had different qualification requirements, different fiscal responsibility levels, different supervisory responsibilities, different client and Board interaction expectations, and different pay levels. (Breña depo p.18, l.24 – p.19, l.2; Breña Aff. ¶ 7.)

18. During the time Ms. Washington held the Human Resources Director position, her responsibilities were not increased and her title did not change. (Breña Aff. ¶ 8.)

19. From 1997 to 2001, the Director of Finance moved from Accounting Manager to Finance Director to Chief Financial Officer, and her salary rose with each new role, although not always simultaneously. (Krause depo p.5, l.22 – p.6, l.4; p.9, ll.13-23; p.11, ll.10-15; p.12, ll.2-13; p.33, ll.1-13; Breña depo p.41, l.19 – p.42, l.8)

20. Within two months or so of Ms. Washington's becoming Human Resources Director, other CCCYMCA directors and executives attended a National YMCA Directors Conference in Florida. Ms. Washington was not invited to this by Ms. Breña, as she understood White directors had. (Washington depo p.145, l.12 – p. 147, l.2.) In fact, Ms. Breña had no role in inviting people to the conference. It was an event open only to members of a professional organization YMCA directors may join at their discretion. (Friedbacher Aff. ¶ 26; Breña Aff. ¶ 14.)

21. During the time Helen Breña supervised Ms. Washington, Ms. Breña's responsibilities were broad and varied, and included supervising several different directors and numerous branches. (Breña depo p. 8, ll. 13-16)

22. Currently, the CCCYMCA includes the following program sites: Alpha Community Services, Bridgeport YMCA, Fairfield YMCA, Hamden/North Haven YMCA, Lakewood-Trumbull YMCA, Milford/Orange YMCA, New Haven Youth Center, Ralphola Taylor Community Center, Sound View Family YMCA, Stratford YMCA, YMCA Camp Hi Rock, Camp Mountain Laurel, Crescent Apartments, Fairfield Apartments, Families-In-Transition, Family Program Center, Harding High School Resource Center, Harrison Apartments, PALS I, II & III Child Care Centers, Program Center, Southend Community Center (Bridgeport), Southend Community Center (Stratford), Southern Berkshire Youth Association, and West Village Apartments. Generally, each of these sites has a separate Board, a different site administrator, potentially multiple program directors, service delivery employees and clerical and

maintenance staff. Each of these facilities receives administrative services from the headquarters staff in New Haven in areas of development, finance and human resources. The New Haven headquarters staff also collects and manipulates program service and financial data to support the program branches in securing, complying with and implementing grants and other funding sources. Some of these sites have been added since Ms. Washington left the CCCYMCA's employ. (Friedbacher Aff. ¶ 10.)

23. As part of the Human Resources Director position, Ms. Washington was required to spend time away from the office visiting branches. (Washington depo p.188, l.22 – p.189, l.2; Breña depo p.32, l.14 – p.33, l.24.)

24. Ms. Breña, as the executive with supervisory responsibility over branch administrators, also spent much time out of the headquarters office visiting branches. (Breña Aff. ¶ 9.)

25. Ms. Breña often does things that are within the responsibilities of others, like authorizing personnel actions, directing staff more than an organizational tier below her, in order to get things done, to lighten the load on her reports and to avoid delay. (Breña depo p.37, l.22 – p.38, l.24; p.39, ll.1-17)

26. Ms. Breña's doing things that are within the responsibilities of others is sometimes an annoyance to her direct reports who might prefer to do these tasks themselves or to have an opportunity to consider or discuss whether, when and how a task is

-5-

accomplished. (Washington depo p.121, l.6 – p.127, l.13; p.128, l.24 – p.129 – l.24; Krause depo p.21, ll.6-16)

27. Eileen Krause, the Finance Director, was displeased when Ms. Breña assigned one of Ms. Krause's direct reports to conduct training without Ms. Krause's advance knowledge. (Krause depo p.21, ll.6-16.)

28. Ms. Breña works a demanding job with a grueling schedule, fitting in meetings and other communications as she can while keeping abreast of the activities of nine different branches and the headquarters functions she oversees. (Breña depo p.8, ll.13-16)

29. Ms. Breña and Ms. Krause have engaged in raised voice exchanges. (Krause depo p.20, ll.3-17; p.21, ll.14-23)

30. A number of employees, including Ms. Washington and Ms. Breña, were gathered in a common area at CCCYMCA headquarters to celebrate a coworker's birthday with a cake. At the instigation of another employee, Ms. Breña revealed that her view of a specific human resources question differed from of Ms. Washington's. (Washington depo p.127, l.14 – p.128, l.23; Breña depo p.22, l.12 – p.23, l.8.)

31. In the Fall of 1999, Ms. Breña noticed an entry she did not understand on Ms. Washington's time sheet, which showed "bereavement leave" and vacation leave for an entire pay period. Ms. Breña asked Ms. Washington what was meant by those entries and Ms. Washington explained that her brother had died when she was already scheduled to be on vacation. Ms. Breña stated she hadn't known Ms. Washington

-6-

planned to be on vacation. Ms. Washington reminded Ms. Breña that she had approved it some time earlier and Ms. Breña agreed it must have been so after looking at her own calendar and noting it was so marked. Ms. Breña was able to process the time report correctly after understanding it. (Washington depo p.105, l.11 – p.112, l.8; Breña Aff. ¶ 10.)

32. Ms. Breña received comments and inquiries from branch executives about their inability to reach Ms. Washington for advice on time-sensitive matters on some occasions. Knowing Ms. Washington's duties required her to travel among the branches, Ms. Breña asked Ms. Washington to make sure headquarters personnel were aware of her planned location so that she could be reached for consultation whenever required. (Breña depo p.28, l.25 – p.34, l.17; Washington depo p.113, l.11 – p.114, l.17; p.188, l.15 – p.190, l.24.)

33. Ms. Breña received several communications about unclarity of written communications from both the Director of Finance, Ms. Krause, and the Director of Human Resources, Ms. Washington. As a result, Ms. Breña instructed both women to give her an opportunity to review and help edit all written communications before they were sent out. (Breña depo p.28, ll.4-24; Krause depo p.27, l.23 – p.28, l.23; Washington depo p.187, l.8 – p.188, l.5.)

34. When Ms. Breña and Ms. Washington met to discuss Ms. Washington's 1999 review, Ms. Washington expressed her dissatisfaction and told Ms. Breña she thought she deserved a higher merit-based increase and an additional increase to bring her salary

-7-

to the same level as the Finance Director's. (Washington depo p.74, l.2 – p.75, l.6; p.161, l.19 – p.162, l.14; Breña depo p.39, l.22 – p.40, l.7; p.63, ll.9-18)

35. Ms. Breña later reviewed the salary placement of Director Human Resources position by formally surveying Human Resources positions in area non-profit organizations and using the resource of the YMCA of the USA's job analysis model to verify the position's salary grade designation and Ms. Washington's placement on the range for that grade. These efforts persuaded Ms. Breña that the job was in the right salary grade and Ms. Washington was at the right point in that salary grade. She so informed Ms. Washington. (Washington depo p.168, ll.13-25; Breña depo p.40, l.22 – p.41, l.3; p.43, l.20 – p.44, l.2; p.64, ll.16-23.)

36. In 2001, Suzanne Friedbacher, who is now CCCYMCA's Human Resources Director, was serving as the Hamden/North Haven branch executive. Ms. Friedbacher was displeased with Ms. Breña's review and merit rating of her performance and pursued this disagreement with written argument. Ms. Breña was fully aware of Ms. Friedbacher's criticism of her when she participated in her selection as the Human Resources Director. (Affidavit of Suzanne Friedbacher ¶ 16)

37. Ms. Breña instructed Ms. Washington to have the 1999 increase Ms. Breña had approved for her processed. (Washington depo p.165, ll.20-23.)

38. Ms. Washington wrote a response to her performance review to record her disagreement and placed it in her personnel file without giving it to Ms. Breña, Ms. Breña's boss, or anyone at all. (Washington depo p.171, ll.17–25; p.164, l.14 –

-8-

p.165, 1.6) Ms. Washington maintained that she had the right to do so and had no obligation to alert her own management. (Washington depo p.169, 1.25 – p.175, 1.10)

39. Some weeks after Ms. Breña and Ms. Washington met to discuss Ms. Washington's 1999 performance review, Ms. Breña noticed in reviewing some financial information that Ms. Washington was still being paid at the salary rate in effect before her recent performance review and merit increase. On investigation, Ms. Breña learned that the required form had not been forwarded to the payroll staff by Ms. Washington and went to Ms. Washington's personnel file. Ms. Breña learned for the first time that Ms. Washington had prepared a written response to her performance review and placed it in her own personnel file without copying or notifying her supervisor, Ms. Breña. (Washington depo p.164, 1.9 – p.165, 1.6; Breña depo p.25, 11.4-9; p.44, 11.3-16)

40. Ms. Washington confirmed that because she felt her merit increase was inadequate she would not accept it and therefore did not follow Ms. Breña's instruction to process the paperwork to payroll. (Washington depo p.165, 1.20 – p.168, 1.4.)

41. Ms. Breña confirmed her disappointment in Ms. Washington's actions in a memo to Ms. Washington. (Friedbacher Aff. ¶ 13 and Exhibit 7 attached thereto)

42. Plaintiff submitted a formal letter of resignation dated February 16, 2000 and her employment with Defendant ended, as her letter announced, on March 31, 2000. (Friedbacher affidavit, ¶ 14 and Exhibit 8 attached thereto)

43. Ms. Washington's resignation letter states the primary reason is her unwillingness to comply with Ms. Breña's demand to see all her additions to her personnel file. (Friedbacher affidavit ¶ 14 and Exhibit 8 thereto; Washington depo p.198, l.25 – p.199, l.23; p.200, l.13 – p.201, l.15.)

44. Ms. Breña determined to accept Ms. Washington's resignation. (Breña depo p.36, ll.12-16.)

45. At the time of her termination, Plaintiff held the position of Director of Human Resources. (Complaint ¶ 7)

46. Before she left, Ms. Washington discussed her resignation reasons with Philip Dwyer, the CCCYMCA's Chief Executive Officer. (Washington depo p.203, ll.21-24.)

47. At the time of her resignation, Ms. Washington was enrolled in a Human Resources Management Certificate Program at Fairfield University's School of Continuing Education that required attendance two nights per week for three hours each night for a full academic year (September to June). The CCCYMCA had encouraged Ms. Washington's enrollment in this course in 1999 and agreed to pay the $1,654 tuition costs. Despite Ms. Washington's resignation, CCCYMCA did not demand repayment or interfere with her completion of the course. (Breña Aff. ¶ 11.)

48. Ms. Washington never told CCCYMCA's management that she believed her race, color or age was a factor in what she believed were adverse decisions made about her prior to submitting her resignation. (Washington depo p.203, l.10 – p.204, l.25.)

49. CCCYMCA's employee handbook describes a grievance procedure giving employees the opportunity to pursue resolution of problems to the Chief Executive Officer. (Friedbacher Aff. 17 and Exhibit 14 attached thereto; Washington depo p.203, l.25 – p.204, l.21)

50. On September 7, 2000, Ms. Washington filed with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") a complaint of race and color discrimination in compensation as of September 1999 through harassment from November 1999 onward and in her constructive discharge on March 31, 2000. (Friedbacher Aff. ¶ 18 and Exhibit 10 attached thereto.)

51. Ms. Washington's complaint was dismissed by the CHRO on January 11, 2001 because its Merit Assessment Review concluded that further investigation would not result in a finding of reasonable cause (Friedbacher Aff. ¶ 19 and Exhibit 11 attached thereto), and the EEOC adopted CHRO's dismissal and issued a Notice of Right to Sue on April 9, 2001. (Friedbacher Aff. ¶ 20 and Exhibit 12 attached thereto)

52. Immediately after Ms. Washington's resignation, CCCYMCA's human resources responsibilities were handled by Ms. Breña and people to whom she delegated. (Breña Aff. ¶ 12)

53. After Ms. Washington's resignation, the idea of a dedicated human resources executive position was again pursued, but with a broader and deeper array of

        responsibilities than Ms. Washington's job had and a reporting relationship directly to the CEO. (Friedbacher Aff. ¶ 21)

54. As reconceived, the Human Resources Director position now had responsibility for staff development, salary administration plans, development and administration of training plans, preparation and monitoring of staff development budget, establishment of training and certification standards and goals, promotion of staff for certification as trainers and ensuring training occurs, coordination of recruitment efforts, supervision of payroll staff, and orientation for new hires. (Friedbacher Aff. ¶¶ 8 and 15 and Exhibits 4 and 9 attached thereto.)

55. In May 2001, an internal and external search concluded with the appointment of Suzanne Friedbacher, a White woman born March 23, 1953. (Friedbacher Aff. ¶ 2)

56. Ms. Friedbacher had worked in the CCCYMCA and its New Haven pre-merger predecessor for ten years and with other YMCA organizations for another eight years, when she assumed this role. She brought to the job her educational achievements of a Bachelor of Science and Master of Education degrees. Her salary was $63,690 per year at the time of her appointment to the position. (Friedbacher Aff. ¶¶ 22-24)

57. Attached as Exhibit A is a true and accurate copy of a resume produced by Plaintiff in response to Defendant's First Request for Production dated December 13, 2001.

THE DEFENDANT
Central Connecticut Coast YMCA

By: */s/ Margaret M. Sheahan/*
Margaret M. Sheahan
Federal Bar No. ct05862
For: Pullman & Comley, LLC
    850 Main Street, P.O. Box 7006
    Bridgeport, CT 06601-7006
    (203) 330-2000
    Facsimile (203) 576-8888
Its Attorneys

## **CERTIFICATION**

Pursuant to Fed. R. Civ. P. Rule 5 (b), I hereby certify that a copy of the above was mailed on December 5, 2003 to all counsel and pro se parties of record.

For the plaintiff LILLIE WASHINGTON:

   Caleb M. Pilgrim
   1404 Whalley Avenue
   Second Floor
   New Haven, CT 06515
   (203)387-2524

_____
Margaret M. Sheahan
Commissioner of the Superior Court

BPRT/67123.2/EMP/495646v1