UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

JAN 9  3 13 PM '04

| | |
|---|---|
| LILLIE WASHINGTON,<br>    Plaintiff, | CIVIL ACTION<br>NO. 3:01cv-1838 (MRK) |
| v. | |
| CENTRAL CONNECTICUT COAST<br>    YMCA .<br>        Defendant | JANUARY 8, 2004 |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**FACTUAL BACKGROUND:**

Defendant Central Connecticut Coast YMCA employed plaintiff, an Afro-American female, since 1993. Plaintiff's last position was that of Human Resources Director in the defendant's Corporate Offices. Plaintiff brought this action for employment discrimination on the basis of her race, color and age. Plaintiff's alleges violations of § 1981, the Connecticut Fair Employment Practices Act , Title VII and Emotional Distress.

Plaintiff alleges that, because of her race, African American, she was not paid the same salary as the other directors in the office. As a factual matter, Plaintiff was paid lower than Eileen Krause, the Finance Director, a white female, despite the fact that she had more seniority than the Finance Director did. After the 1999 review, the Finance Director's salary was $51,500.00. (See Exhibit A) The Finance Director had no supervisory experience, no departmental experience, and had only come to the YMCA in 1996 with little experience in a mom and pop store as a bookkeeper. By contrast, the Plaintiff's salary after review in 1999 was $42,400.00, a $9,000.00 disparity. (See Exhibit B)

1

Similarly, the Plaintiff's successor as Human Resources Director, Suzanne Friedbacher, was paid a salary of in excess of $60,00.00 annually when she took over the Plaintiff's position. (Exhibit C) The Executive Director, Helen Brena, was herself awarded equity increases, while the Plaintiff was refused, and deliberately kept at a relatively meager pay (See Exhibit D).

The defendant's <u>Personnel Policy and Employee Benefits Guide</u> provides in Article VII – Wage and Salary Administration that:
> The YMCA maintains a wage and salary administration plan to provide that all employees are paid according to fair and uniform principles and in relation to the responsibility and value they make to the Association's success. Within the capability to do so, employees are also paid at a level competitive with salaries in other similar organizations. (Exhibit E - Defendant's <u>Personnel Policy and Employee Benefits Guide</u> at 9).

When the plaintiff asked her supervisor, Ms. Brena, to increase her salary to the same level as other directors, the supervisor refused, and conducted a virulent campaign of harassment, vilification and abuse against the Plaintiff. The supervisor referred to the plaintiff as "stupid, so stupid", and frequently disparaged her in the presence of other staff.

By way of examples, Plaintiff's supervisor made demands on Plaintiff that were not placed on other similarly situated employees. Plaintiff was questioned about hours on her time sheet, and was further told to give all of her memos to her supervisor before the plaintiff sent them out. Plaintiff's supervisor ordered her to account for her time on a daily basis.

Plaintiff's supervisor also undermined plaintiff's authority by making decisions that should have been made by the plaintiff e.g. by signing the authorization

2

forms in lieu of the Human Resources Director. Normally, plaintiff, as Human Resources was responsible for signing these forms. Besides arrogating to herself certain of the Plaintiff's responsibilities, plaintiff's supervisor she spared no effort to humiliate Plaintiff in front of her co-workers by speaking to the Plaintiff in a harsh and degrading tone of voice.

Defendant never gave the Plaintiff the recognition she deserved, e.g. for establishing a Job Exchange Program for the Defendant. Plaintiff also helped initiate urban and suburban mixing with respect to the Defendant's activities, which had not been done before. This was touted everywhere by the Defendant, but the plaintiff was never given any credit for initiating this program. Plaintiff took time after work to go to schools to proselytize and publicize the defendant's programs and activities, and distribute defendant's fliers. She often used her Saturdays as well to promote her employer's business. Yet, Defendant refused/failed to recognize the Plaintiff's work, accomplishments, and to reward her efforts on behalf of the employer. Instead, plaintiff was subjected to a virulent campaign of harassment, vilification and abuse, with a supervisor who callously and publicly referred to her as "stupid, so stupid", and frequently disparaged her in the presence of other staff.

This case involves claims under § 1981, Connecticut Fair Employment Practices Act, Title VII, and Infliction of Emotional Distress. Because of the Defendant's actions, and the severe, intolerable, inhospitable and hostile working environment fostered by this Defendant, the Plaintiff, like many of the Defendant's other black employees, was obliged to leave the Defendant's employ on March 31, 2000. Since that date, the Plaintiff has remained largely unemployed, except for various temporary job assignments.

**LEGAL STANDARD:**

I.  **Motions For Summary Judgment Are to Be Considered In The Light Most Favorable to The Non-Moving Party**

Summary judgment is only appropriate when there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P 56(c); Galabya v. New York City Bd. of Edu., 202 F.3d 636, 639 (2d Cir. 2000) ( citing Fagan v. New York State Elec. & Gas Corp., 186 F.3d 127, 132 (2d Cir. 1999)).

The burden of showing that no genuine factual dispute exists rests upon the moving party. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir 2000) (citing Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994)). Once the moving party establishes that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to "set forth specific facts showing there is genuine issue for "trial." Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In assessing the record to determine if such issues exists, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. 242; Heilweil v. Mount Sinai Hosp., 32 F 3d 718, 721 (2d Cir.1994). "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. See Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir .2000).

In discrimination cases, the plaintiff must show that he or she belongs to a protected minority, that he or she has applied for and is qualified for an available position, that the employer rejected the application, and that the employer continued to seek applicants with the complainant's qualifications. If a prima facie case is established, then the burden is on the employer to show a legitimate reason for rejecting the applicant. If the employer meets this burden, the employee must then show that the reason given was just a pretext for unlawful discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)

In St. Mary's Honor Ctr. v. Hicks 509 U.S. 502, the Supreme Court noted that:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by as suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was when it noted that, upon such rejection","no additional proof of discrimination is *required*."

Hicks, 509 U.S. at 511 (emphasis in original).

In EEOC v. Ethan Allen, Inc., 44 F.3d 116 (2d. Cir. 1994), the Second Circuit examined whether the plaintiff had produced sufficient evidence to avoid summary judgment. The court explained that all that was required to avoid summary judgment under Hicks, was evidence of pretext together with a prima facie case. EEOC v. Ethan Allen, Inc. at 120 (a finding of pretexuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and thus permits the inference of unlawful discrimination). The court went on to state that the plaintiff's evidence that the defendant's asserted reasons

5

were inconsistent created sufficient doubt as to the truthfulness of those reasons to support the inference of discrimination. Id. at 120-121 (stating that the credibility of the defendant's reasons was better left for the jury to resolve").

The matter of discrimination came before the Southern District Court of New York in <u>Kim v. Dial Service International, Inc et al.,</u> (No. 96 CIV. 3327(DLC), Aug. 11, 1997. <u>Kim</u> held that:

> The jury was entitled to make a judgment, based on all of the evidence, as to whether the defendants discriminated against the plaintiff because of his race and whether one of these forms of discrimination was the execution of a salary policy and practice to pay a Korean officer at a lower salary level than a Japanese officer. (1997 WL 458783, *8 (S.D.N.Y.)

In the instant case, the varying and inconsistent treatment of the plaintiff, when compared to its treatment of similarly situated, non-minority employees, raise issues of credibility, and are unworthy of belief. The Matter should therefore be left to the jury to decide.

A.  **<u>There Is A Fair Preponderance Of Evidence In This Case From Which A Rational Fact Finder Could Reasonably Infer That The Defendant Intentionally Discriminated Against The Plaintiff By Paying Her Less Than Other Similarly Situated White Employees</u>**

   1. **Contrary To The Defendant's Allegations, There Exists In This Case A Fair Preponderance Of Evidence That Plaintiff Was The Victim Of Unlawful Discrimination In Violation Of Section 1981.**

Plaintiff Washington is an African-American, who held the position of Human Resources Director with the defendant. She is a protected minority, who qualified for the position that she held. This case ultimately revolves around the

issue of unequal pay, retaliatory harassment of the plaintiff employee after a pay dispute with her supervisor, and the eventual termination of the plaintiff's employment. Plaintiff alleges among other things, that defendant "discriminated against her on the basis of race, color ..." in violation of 42 U.S.C. SS 1981.

Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws ... as is enjoyed by white citizens....". A party proceeding under § 1981 is not restricted by the administrative and procedural requirements of Title VII. However, Title VII and 1981 are not mutually exclusive. Johnson v. Ryder Truck Lines, Inc., 575 F.2d 471 (4th. Cir. 1978) cert. denied, 440 U.S.979, 99 S.Ct. 1785). For, Congress intended these remedies to be "co-extensive" and to "augment each other".

In Texas v. Burdine, 101 S.Ct. at 1089, (1983) the Supreme Court held that a plaintiff alleging racial discrimination in wages need only show, by a preponderance of the evidence, that he received lower wages than employees performing comparable tasks under circumstances which give rise to an inference of discrimination. Burdine, 101 S.Ct. at 1094, n. 6. Plaintiff Washington, a Human Resources Director, has presented evidence that a white female Director of Finance, was paid far more than the Plaintiff. (Exhibit A) Similarly, a another white female, who was hired a year after the Plaintiff, as Human Resources Director, and who essentially performed the same tasks as the Plaintiff, received $63,690 annually, beginning the year after the plaintiff was forced to resign. (Exhibit C) Plaintiff, by contrast, received only $42,400.00, per year up until her termination in 2000. (Exhibit B) It is thus submitted that the Plaintiff has met the "not onerous" burden of establishing a prima facie case of disparate treatment. Burdine at 1094.

The disparity between the Plaintiff's salary, and that of the Finance Director, in the applicable period, 1999-2000, was $9,100.00 or 21%. The disparity between the Plaintiff's salary, and that of the her successor Human Resources Director, less than a year later, was $21,500.00, or approximately 33%. (Plaintiff's Exs. A,B,C).

To justify the disparity, Defendant initially stated that when Ms. Washington raised with the defendant the question of her salary increase:

> Ms. Brena disagreed and explained the basis for her merit rating judgments about Ms. Washington's performance and the differing job content elements that underlay the difference in the salary rates for the two positions. Later Ms. Brena did review the salary placement of the Director of Human Resources position. (Defendant's Memorandum at 9, citing to Washington Deposition p.165, ll.20-23.)

The defendant later offers another explanation as a justification for paying the plaintiff less than other directors. Subsequently, defendant states that:

> Ms. Brena later reviewed the salary placement of Director Human Resources position by formally surveying Human Resources positions in area non-profit organizations and using the resource of the YMCA of the USA's job analysis model to verify the position's salary grade and Ms. Washington's placement on the range for that grade. These efforts persuaded Ms. Brena that the job was the right salary grade and Ms. Washington was at the right point in that grade. (<u>Defendant's Local Rule 56(a) Statement.</u> ¶ 35 at 8)

8

But, if consulting the national USA job analysis model to determine the salary increase of the Human Resources Director was the defendant's policy, it was never done in other cases. The Defendant did not do this to determine the Director of Finance's salary. Nor did the defendant do this to determine the salary of the plaintiff's successor as Human Resources Director, when it awarded the new successor an increase of 33% over the salary of the plaintiff a year after the plaintiff's termination.

Defendant can point to no other instance wherein the defendant consulted national pay scales to determine pay increases. Defendant states that this is so because no one else asked for a review. However, given the substantial difference between the Finance Director's salary and that of the plaintiff, it appears improbable that the Finance Director would have asked that her salary be reviewed. Similarly, given huge gap between the subsequent Human Resources Director's salary and that of the plaintiff, it appears improbable that the former would have asked that her salary be reviewed.

The defendant's " practice" was therefore inconsistently applied, and clearly not followed in other cases. Thus, the defendant failed follow its own employment policies, with respect to employee pay.

The defendant's explanation that it consulted the national USA job analysis model to determine the plaintiff's salary as Human Resources Director conflicts with its explanation of its efforts to equalize New Haven and Bridgeport salaries for those holding similar responsibilities. Was the disparity between the Plaintiff's salary and that of the Director of Finance part of the defendant's attempt at an equity increase "implemented to bring New Haven-originating positions to levels comparable to Bridgeport-originating positions with similar responsibilities?" Was the 33% disparity between the Plaintiff's salary and that of

9

the successor Human Resources Director, a year later, part of the defendant's attempt at an equity increase implemented over several years to bring New Haven-originating positions to levels comparable to Bridgeport-originating positions with similar responsibilities?"

Defendant offers yet another explanation, stating that "Ms. Brena also considered the local market rates for human resources positions with nonprofit entities. These efforts did not change, but rather confirmed the salary set for Ms. Washington. (Defendant's Memorandum at 26, citing to Brena deposition p.40, l.22- p.41, l.3; p.43, l.20 – p.44, l.2; p.64, ll.16-23.)

The defendant also offers yet another explanation. Defendant had previously claimed that:

> CCYMCA came into existence in 1994 ... CCYMCA took steps to equalize the compensation levels for parallel positions that had existed in the two component entities prior to the merger. "Equity" increases were implemented over several year to bring New Haven-originating positions to levels comparable to Bridgeport-originating positions with similar responsibilities. (Defendant's Local Rule 56(a) Statement. ¶¶ 10-11 at 2)

The explanations proffered by the defendant, are in short, little more than conflicting, contrived and cosmetic, intended solely to conceal its discriminatory practice and skirt responsibility therefor. For, while the defendant's actions in consulting the national USA job analysis model, and other sources, to determine the plaintiff's salary increase as Human Resources Director appear facially neutral, they were in fact, arbitrary, selective and discriminatory, when applied, exclusively to Ms. Washington.

Moreover, the defendant began the successor Human Resources Director at a salary some 33% higher than the salary paid plaintiff the previous year. This suggests that the 33% salary increase may have been prompted by the plaintiff's complaint that she was underpaid relative to her white counterpart, Finance Director. This fact – the 33% increase for the new Human Resources Director's salary - clearly raises the possibility that the plaintiff's ongoing complaint that she was underpaid - relative to those similarly situated - may have been legitimate. When considered in a light most favorable to the plaintiff, non-moving party in this case, and, as a factual matter, this issue should therefore be left to the jury.

Notwithstanding the defendant's attempts to craft performance issues here, nothing in the record supports any hint of disciplinary actions by the defendant against this plaintiff. It is thus undisputed that Plaintiff's work performance during the period, in the years before, and immediately prior to her discharge, at the defendant YMCA was consistently good (Exhibit B). Plaintiff, was at the time of her termination, an employee in good standing, and under no disciplinary program with this defendant.

Still, among other things, the defendant YMCA, and its agent, Brena, insulted and abused the plaintiff, calling her "stupid, so stupid", after selectively and arbitrarily deciding to consult a national pay scale, when the plaintiff requested a pay raise.

Per <u>Burdine</u>, a plaintiff may succeed in demonstrating that an employer's proffered reason for an employment decision was not its true reason "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Burdine</u>, 101 S.Ct. at 1095. These factual

circumstances, in addition to the pay disparity itself, are sufficient to give rise to an inference of discrimination. The evidence and the totality of the circumstances here clearly show that the defendant's reasons for the pay disparity between the plaintiff and others similarly situated were a pretext for discrimination.

Rather than pay the plaintiff according to the "fair and uniform principles and in relation to the responsibility and value" she made to the Association's success, as required by defendant's <u>Personnel Policy and Employee Benefits Guide</u> at 9), defendant consistently undervalued and underpaid the Plaintiff. Rather than pay the plaintiff "within the capability to do so ... at a level competitive with salaries" within its own organization, defendant consistently undervalued and underpaid the Plaintiff, annually, by figures ranging from $9,000.00 to $21,500.00. It is undisputed that the defendant had the capability to do so, because it paid others much more than it paid the plaintiff.

The plaintiff raises a genuine issue of material fact as to whether the defendant's reasons for paying her a lower salary than that of the Director of Finance, and that of her successor as Human Resources Director, were pretexts for discrimination. Based on a Burdine analysis as to claims of pay disparity, defendant's actions raise a clear inference of racial discrimination. This issue remains a fact question. It should, therefore, as a factual question, properly be preserved for/tried to the jury.

II.     **<u>The evidence in this case also clearly shows that Plaintiff was harassed and ultimately discharged in retaliation for complaining about the pay disparity.</u>**

Section 704(a) of Title VII prohibits an employer from discriminating "against any of his employees ... because [the employee] has opposed any practice made unlawful by this subchapter." 42 U.S.C. 2000e-3(a).

Retaliatory discharge claims are subject to the same shifting burden analysis as disparate treatment claims. Plaintiff Washington must first establish a prima facie case of retaliation. The burden then shifts to the defendant CCYMCA, to articulate a legitimate, nondiscriminatory reason for its action. If defendant CCYMCA meets this burden, Washington must then show that the reasons advanced by CCYMCA are pretextual. Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 64-65 (2d Cir.1992).

The standards for a prima facie case of retaliation are that "a plaintiff must show participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." Id.; Johnson v. Palma, 931 F.2d 203, 207 (2d Cir.1991). The necessary causal connection may be established "either 'indirectly by showing that the protected activity was followed closely by discriminatory treatment ... or directly through evidence of retaliatory animus directly against a plaintiff by the defendant.' " Johnson, at 207 ( citing DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir.1987), cert. denied, 108 S.Ct. 455 (1987)). On pretext and retaliation, see also White v. Gallagher Bassett Services, Civil Action No.02-2364, April 22, 2003, 257 F. Supp.2d 804 (Exhibit G) and Brown v Prudential Bache Securities, 1992 WL 350792 (S.D.N.Y.) (Exhibit H)

Plaintiff Washington meets all of these requirements. It is undisputed that plaintiff complained to the defendant about what she believed to be a discriminatory practice and that she was discharged after making the complaint.

13

She also demonstrated that her discharge was the direct result of her inability to follow Ms. Brena's orders, foisting an inequitable and disputed pay increase on the plaintiff. Clearly, Plaintiff's Supervisor, Brena, retaliated against her in this case.

Defendant asserts that Ms. Brena was the plaintiff's benefactor as well as what plaintiff characterizes as adverse. While Ms. Brena may have played some role in Ms. Washington's appointment as Human Resources Director, attitude changed once Ms. Washington raised the issue of equal pay. The fact is that Ms. Brena considered Ms. Washington a good person, so long as she was pliable, and would accept the unequal pay tendered her. Once the plaintiff disagreed with Brena, and raised the issue that she was paid far less than her white counterparts, Ms. Brena retaliated against her. Hiring, perhaps, and one or two sporadic and perfunctory attempts to grant a raise – which still falls far short of equal pay for similarly situated employees within the defendant's organizational structure – do not trump discriminatory treatment.

Issues critical to the disposition of Plaintiff Washington's pay disparity and retaliatory discharge claims remain in dispute. Plaintiff presents issues of fact that normally preclude summary judgment. This defendant's motion for summary judgment should therefore be denied as to all of those claims.

### III. Plaintiff Was Forced To Resign As A Direct Result Of The Defendant's Actions. Plaintiff's Claim For Constructive Discharge Is Proper in this Case.

Constructive discharge occurs where an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. Bourque v. Powell Elec. Mfg. Co., 617 F.2d 5th. Cir.

14

1980) 65; Young v. Southwestern Sav. And Loan Ass'n., 509 F.2d 140, 144 (5th. Cir 1975); EEOC v. Federal Reserve Bank, 698 F. 2d633, 672 (4th. Cir 1983; Muller v. United States Steel Corp., 509 F.2d 923, 929 (10th. Cir.), cert. denied 423 U.S. 825 (1975).

To find constructive discharge, the trier of fact determines whether or not a reasonable person in the employee's position and circumstances would have felt compelled to resign. Garner v. Wal-Mart Stores, Inc., 807 F. 2d 1536, 1539 (11th Cir. 1987) (part of an employee's obligation to be reasonable is to complain to higher management and if the problem is not addressed file EEOC charge – as plaintiff did in this case).

For purposes of establishing prima facie case of intentional race or sex discrimination, employee's claim of constructive discharge is established by proof of subjection to unreasonable risk of physical harm or significant verbal abuse, or of being forced to accept significantly lower pay or inferior working conditions. Civil Rights Act of 1964, S 701 et seq., 42 U.S.C.A. S 2000e et seq. The evidence is undisputed that Ms. Washington was forced to accept significantly lower pay in this case.

In Order for the Plaintiff Lillie Washington to recover on her claim of constructive discharge against the defendant, she must prove that the defendant intentionally discriminated against her. She must prove by a preponderance of the evidence:

1. That the defendant deliberately made her working conditions so intolerable that a reasonable person in the plaintiff's position would have felt forced to resign; and,

2.  That plaintiff's race was a motivating factor in the defendant's conduct, and,

3.  The plaintiff's resignation was a reasonably foreseeable result of the defendant's actions.

In <u>Satterwhite v. Smith</u>, 744 F.2d 1380, 1382-83 (9th Cir. 1984) the court held that repeated denial of promotion which prevented plaintiff from gaining access to training and advancement opportunities, humiliation suffered by plaintiff in training persons who were promoted over her, and relegation to disproportionate share of dull work provided grounds for constructive discharge. In <u>Clark v. Marsh</u>, 665 F.2d 1168, 1174 (D.C. 1981) the D.C. Circuit held that repeated denial of promotions, coupled with filing of administrative complaints with no result and with embarrassment, yields constructive discharge.

In <u>Williams v. Caterpillar Tractor Co.</u>, 770 F.2d 47, 49-50 (6th. Cir. 1985) the Sixth Circuit held that demotion from Grade 10 to Grade 2 position coupled with manual labor and dramatic change of duties equals sufficient grounds for constructive discharge. In <u>Buckley v. Hospital Corp. of America, Inc.</u>, 758 F.2d 1525, 1530-31 (11th. Cir. 1985) the court held that it was a jury question whether demotion of a long time supervisor, combined with being forced to work for a person with whom she had a personality conflict and humiliation suffered therefrom, constituted constructive discharge.

Defendant argues that because the plaintiff gave 6 weeks notice of her "resignation", that this means that her resignation is "virtually de facto not due to intolerable conditions". The defendant's <u>Personnel Policy and Employee Benefits Guide</u> required that:

16

>A written notice of the resignation shall be provided to the YMCA at least 30 days prior to the last day of employment for exempt employees and 10 working days for non-exempt employees... By providing the YMCA proper notice, as shown above, the employee will be paid for the accrued and credited, but unused, vacation time earned from the last vacation period up to the termination date. defendant's <u>Personnel Policy and Employee Benefits Guide</u> at 19. (Exhibit F)

Ms. Washington, as a responsible professional, was required to give advance notice of her resignation and correctly did do. She should not now be faulted, as the defendant attempts to do, for having followed the proper protocol required by the defendant's own <u>Personnel Pollicy and Employee Benefits Guide</u>.[1]

Defendant in this case demonstrated no interest in retaining Ms. Washington. In fact, defendant's Brena readily welcomed Ms. Washington's resignation immediately Ms. Washington offered it.

The fact of a gross disparity in pay, coupled with persistent harassment by her supervisor, created a hostile, severe and intolerable working environment, calculated to drive the plaintiff from her employment. These issue render a claim of constructive discharge in this case. Whether the plaintiff's "resignation" was coerced by the defendant is ultimately a fact question for the jury.

---

1. Defendant attempts to make some play of the fact that Ms. Washington enrolled in a Human Resources Management Professional Program at Fairfield University," in 1999, and after her termination, the defendant "did not demand repayment or interfere with her completion of the course". <u>Defendant's Local Rule 56(a)1 Statement 47 at 10</u>. This argument by the defendant in no way defeats Ms. Washington's claims that she was not paid fairly or commensurately with other directors, and with her responsibilities.

In light of the proofs in this case, the recent deposition testimonies by the parties, and other materials, the Plaintiff maintains that there are good grounds support any and all of her claims in this matter. When viewed in the light most favorable to the plaintiff, it cannot be said that a reasonable fact finder could absolutely not find in the plaintiff's favor, and that the plaintiff has no chance whatsoever of recovery. From this perspective, defendant motion for summary judgment should be denied.

Respectfully Submitted,
THE PLAINTIFF
LILLIE WASHINGTON

By: *(signature)*
Caleb M. Pilgrim
Law Offices of Caleb M. Pilgrim, LLC
1404 Whalley Avenue - 2nd Floor
New Haven, CT 06510
Tel: 203-387-2524
Federal Bar No. ct 14857

### CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid, this 7th. day of January, 2004 to:

Lillie Washington
1264 Capitol Avenue
Bridgeport, CT 06606

Attorney Margaret M. Sheahan
Pullman & Comley, LLC
850 Main Street
Bridgeport, CT 06601-7006

*(signature)*
Caleb M. Pilgrim

---

Moreover, to have interfered with Ms. Washington's completion of the course could have been reasonably construed as additional retaliation and harassment.

18