Not Reported in F.Supp.2d                                                                                                   Page 1
(Cite as: 2003 WL 22004255 (D.Conn.))

H
Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.

NEW HORIZON FINANCIAL SERVICES, LLC
v.
FIRST FINANCIAL EQUITIES, INC.

No. 3:00 CV 1461(JBA).

March 26, 2003.

Jeffrey R. Hellman, Lawrence S. Grossman, Zeisler & Zeisler, P.C., Bridgeport, CT, for Plaintiff/Third-Party Defendants/Counter-Defendant.

Harold F. Bernstein, Zone & Bernstein, Stamford, CT, for Plaintiff/Counter- Defendant.

Benjamin Aaron Pushner, Erik J. Winton, Fitzhugh, Parker & Alvaro, Boston, MA, Steven Sloan Anderson, Mark Morvay Rottenberg, Anderson & Rottenberg, New York, NY, for Defendants/Third-Party Plaintiffs/Counter-Claimants.

Mark A. Newcity, Fitzhugh, Parker & Alvaro, Hartford, CT, Harry W. Lipman, Anderson & Rottenberg, New York, NY, William N. Dimin, Spector & Dimin, Englewood, NJ, Timothy B. Yolen, Yolen & Perzin, New Haven, CT, for Defendants.

*RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR SUMMARY ENFORCEMENT OF SETTLEMENT AGREEMENT*

MARGOLIS, Magistrate J.

*1 The factual and procedural history behind this action is summarized by United States District Judge Janet Bond Arterton in her Order, filed January 21, 2003. (Dkt.# 88). On January 30, 2002, plaintiff New Horizon Financial Services, LLC, and third-party defendants Larry Rezak, Michael Klemenz, and Terry Williams [collectively "New Horizon"] and defendants First Financial Equities. Inc. ["First Financial"] and David Sadek [collectively "First Financial"] stipulated for referral of the case to the Honorable Robert C. Zampano for mediation, which stipulation was approved by Judge Arterton. (Dkt. # 70). On February 7, 2002, the Clerk's Office issued its Local Rule 16(b) Notice to Counsel, indicating that on the previous day, "Judge Zampano reported the ... case as settled." (Dkt.# 72).

On July 22, 2002. New Horizon filed its Motion for Summary Enforcement of Settlement Agreement with an affidavit of Attorney Lawrence S. Grossman ["Attorney Grossman"] and its brief in support. (Dkts. 79-80). [FN1] Nineteen days later, First Financial filed affidavits of Attorney William N. Dimin and Attorney Harry W. Lipman ["Attorney Lipman"] in opposition (Dkts. 83- 84), [FN2] as to which New Horizon replied on August 20, 2003 (Dkt.# 85). [FN3] A supplemental affidavit by Attorney Grossman was also filed on that date. (Dkt.# 86). [FN4]

FN1. Two exhibits are attached to the motion (Dkt.# 79): copy of draft settlement agreement (Exh. A); and copy of draft stipulation of dismissal, dated February 12, 2002 (Exh. B).
The same two exhibits were attached to the brief in support (Dkt.# 80).

FN2. Attached to Attorney Lipman's affidavit (Dkt.# 84) are the following five exhibits: copy of e-mail, dated February 8, 2002, with another copy of the draft of settlement agreement and a copy of the draft of general release (Exh. A); copy of fax cover sheet from Attorney Lipman to Attorney Grossman, dated February 14, 2002, with copy of draft settlement

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

agreement with handwritten changes, copy of draft of general release with handwritten changes, and copy of draft stipulation of dismissal with handwritten changes (Exh. B); copy of e-mail, dated February 19, 2002 (Exh. C); copy of e-mail, dated March 1, 2002, with copy of draft Joint Motion to (A) Vacate the Clerk of Court's February 6, 2003 Notice to Counsel and (B) For Extension of Time, dated March 4, 2002 (Exh. D); and copy of e-mail, dated March 2, 2002, with another copy of draft Joint Motion to (A) Vacate the Clerk of Court's February 6, 2003 Notice to Counsel and (B) For Extension of Time, dated March 4, 2002 (Exh. E).

FN3. Attached is another copy of the February 14, 2002 fax cover, with another copy of the settlement agreement and of the draft stipulation of dismissal, both with handwritten changes. (Exh. A).

FN4. The same exhibit is attached (Exh. A).

In her Order, Judge Arterton referred this motion to this Magistrate Judge for an evidentiary hearing, and narrowed the focus of the hearing "to ... resolve [ ] ... whether a binding agreement was, in fact, reached at the February 6 medi[ ]ation session." (Dkt. # 88, at 5). Following a telephonic status conference held on January 31, 2003 (Dkts. 91-92), on February 11, 2003, this Magistrate Judge filed Ruling on Testimony of Mediator at Evidentiary Hearing (Dkt.# 93), which held that Judge Robert C. Zampano may testify at the evidentiary hearing on New Honzon's motion pursuant to Conn. Gen.Stat. § 52- 235d(b) Such evidentiary hearing was held on March 5, 2003 at which Klemenz, Rezak, Williams and Attorney Grossman testified for New Horizons and Attorney Lipman testified for First Financial (Dkts. 95-97, 99); [FN5] Judge Zampano was the sole witness on March 24, 2003. (Dkts. 94 & 98).

FN5. The transcript from March 5 (Dkt.# 99) is referred to as "Tr."

*I. FACTUAL FINDINGS*

The four witnesses for New Horizon, namely Klemenz, Rezak, Williams, [FN6] and Attorney Grossman all testified that on February 6, 2002, they attended a full day of mediation with Judge Zampano on behalf of New Horizon. First Financial's representatives included David Sadek, Elly Krieger, Attorney Jay Zucker, and Attorney Lipman. (Tr. 6-9, 15, 33, 44, 53-54. *See also* Tr. 125-26). All four witness testified that after alternatively meeting with New Horizon, First Financial and the attorneys, the parties agreed to settle the lawsuit on the following terms: that First Financial would pay New Horizon the aggregate amount of $190,000.00, in twelve monthly installments of $15,833.33, commencing on March 1, 2002 and terminating on February 3, 2003, and that First Financial would release any claim to, and surrender physical possession of the Variable Universal Life Insurance Policy on the life of Linda Rezak; these three elements of settlement were all addressed in the presence of Klemenz, Rezak, and Williams. (Tr. 9-12, 15-17, 19-28, 33-37, 38-39, 44-48, 49-50, 54-56, 57- 59, 64, 91-96, 115-117. *See also* Tr. 127-29, 146-47, 150-51).

FN6. Williams testified that the three partners were like a "troika," the Russian word for a Russian vehicle drawn by three horses abreast, which form a team, and at times, one person took on more responsibility than the other two; according to Williams' testimony, Rezak held the lead with respect to this litigation. (Tr. 49).

*2 New Horizons argues that the parties agreed to three further settlement terms: that First Financial would waive defenses to claims asserted by New Horizon, and dismiss all claims against Rezak, Klemenz and Williams; that New Horizon would be entitled to seek an entry of default against both defendants Sadek and First Financial, jointly and severally, for the full amount, less any payments previously made, plus any attorneys' fees incurred by New Horizon in the enforcement of settlement, plus interest at the rate of ten percent annum from the date of default, should First Financial default and fail to cure such default; and this Court would retain jurisdiction over this matter in case of default.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Rezak, Williams and Klemenz all testified that the issue of a default judgment against Sadek was not discussed at the mediation session in their presence, nor was the issue of retention of jurisdiction in Connecticut. (Tr. 28-30, 39-43, 50). Rezak, however, also testified that although these issues were not explicitly discussed, it was "implicit" to him that they were part of the agreement and because he felt these two terms were important and because of the "good will" expressed among the parties at the conclusion of the mediation, [FN7] he "assumed" that Sadek would pay New Horizon if First Financial defaulted and that Connecticut would retain jurisdiction. (Tr. 39-43. See also Tr. 14)

> FN7. Klemenz, Rezak, Williams, Attorney Grossman and Attorney Lipman all testified that at the conclusion of the mediation session, the parties all shook hands (Tr. 12-13, 37-38, 48, 62-63, 147-48). Attorney Grossman described defendant Sadek as "show[ing] himself to be [a] mensch." (Tr. 63, 96). Additionally, Klemenz and Rezak testified that while shaking hands with defendants, they made comments that they were happy this was behind them so that they could now continue to conduct business with each other. (Tr. 12-13, 37-38).

Attorney Grossman believed that he discussed each of these issues in the presence of his clients at the mediation. (Tr. 118). He clearly recalled that he did discuss them with Attorney Lipman in the presence of Judge Zampano (Tr. 60-61, 116-19). Furthermore, according to Attorney Grossman, the attorneys agreed that *defendants* would be liable for the $190,000.00 in the event of default and the "defendants" in this case are First Financial *and* Sadek. (Tr. 60-61, 64). Furthermore, Attorney Grossman testified that the attorneys agreed that liability would be imposed after the necessary affidavits were submitted to *this* court, meaning the District Court of Connecticut. (Tr. 60-61).

In contrast, Attorney Lipman, however, only recalled that an agreement was reached as to the amount of money that would be paid to New Horizon [FN8] and the time period in which it would be paid; he testified that he did not recall who was to pay the money just that plaintiffs were entitled to it regardless of who was to pay. (Tr. 129-32, 147, 156-57).

> FN8. Until Attorney Lipman's recollection was refreshed, Attorney Lipman could not recall the exact amount that Judge Zampano recommended and to which, in turn, the parties ultimately agreed. (Tr. 129-30). The Court finds it inconceivable that an experienced litigation attorney, called to testify in federal court, would not have reviewed his notes and/or affidavit prior to his appearance on the stand.

Judge Zampano, who conducts approximately 110-30 mediation sessions a year, testified that he has no independent recollection of this mediation held on February 6, 2002, beyond his one page of notes (Exh. 9) His notes reflect that the parties agreed to his recommended settlement figure of $190,000, payable in twelve equal installments commencing on March 1, 2002. Judge Zampano acknowledged that after attorneys and parties leave a successful mediation before him, there can be issues that subsequently arise which can "crater" a settlement. [FN9] If such issues are discussed in his presence, he would make appropriate entries on his notes. If the attorneys agreed in his presence that only a corporate defendant were responsible for payment. Judge Zampano similarly would indicate that in his notes as well. Judge Zampano's notes contain no such entries, and he had no recollection, one way or the other, that there were any "outstanding issues" with respect to this particular settlement.

> FN9. Judge Zampano testified that when counsel encounter obstacles in consummating a settlement, counsel often will contact him, and he will thereafter schedule a telephone conference with counsel, where he usually is successful in resolving these issues.
> The Magistrate Judge is at a loss why both counsel failed to avail themselves of that opportunity or continue to attempt to resolve the limited outstanding issues. Had they acted like mature adults, with their clients' best interests in mind, all of this

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

unnecessary expense and time could have been avoided. (Tr. 114-15, 139-42).

*3 Upon conclusion of the February 6, 2002 mediation session, Judge Zampano reported the case as settled and the Clerk of the Court issued the Rule 16(b) Notice to Counsel. (Dkt.# 72).

Two days later, Attorney Grossman drafted the settlement agreement and stipulation of dismissal based on his recollection of what had been agreed to at the mediation, and forwarded them to Attorney Lipman by e-mail. (Exhs. 2-4; Tr. 65-66, 99-102. See also Tr. 132-34). Attorney Grossman testified that when he sent the draft to Attorney Lipman Attorney Lipman informed him that it only needed "cosmetic changes" a comment which Attorney Lipman denies. (Tr. 66-67, 102, 104, 149)

On February 14, 2002, Attorney Lipman sent Attorney Grossman a fax cover letter, with his "mark-up of the draft" (Exh. 5, Tr. 67-68, 102-03), because, as Attorney Lipman testified, it was "objectionable," "overly complicated," "overlawyered," and included "material terms" to which Attorney Lipman did not agree (Tr. 134-35) Attorney Lipman testified that his draft was "not inconsistent with what we had agreed [to] at the mediation" (Tr. 160-61).

Of the twenty-nine paragraphs in the seven-page settlement agreement four paragraphs are at issue here Attorney Grossman's draft of ¶ 5 provided that "[First Financial] and Sadek expressly agree to waive any and all defenses to any claims asserted against [First Financial] by [New Horizon] in the Action." In his mark-up. Attorney Lipman eliminated this paragraph in its entirety Attorney Grossman testified that he could not settle this lawsuit and allow First Financial to be able to assert defenses against New Horizon. (Tr. 70-71). Attorney Lipman, in contrast, described ¶ 5 as "over reaching" and "surplusage" in light of the language of the releases, and testified that he never agreed to it. (Tr. 136-37, 151-52).

Attorney Grossman's draft of ¶ 6 provided that "[i]n the event of a default and failure to cure by [First Financial] and Sadek, [New Horizon] may immediately apply in the Action for the entry of a judgment by the Court against [First Financial] *and Sadek, jointly and severally,* in the full amount claimed to be due and owing by [First Financial] and Sadek ...." (emphasis added). In his mark-up. Attorney Lipman, *inter alia,* eliminated the words "and Sadek, jointly and severally" Attorney Grossman testified that this cross-out was inconsistent with ¶ 2, to which Attorney Lipman did not object, which began: "[First Financial] and Sadek, individually, shall pay to [New Horizon] the aggregate amount of One Hundred Ninety Thousand Dollars...." (Tr. 71-72). Attorney Grossman further testified that the cross-out was inconsistent with ¶ 3, which began: "To the extent that any payment is not received [First Financial] and Sadek shall be considered in default of this Settlement Agreement." (Tr. 72-73). In addition, Attorney Grossman further testified that this cross-out was inconsistent with the opening sentence of ¶ 6, which read: "In the event of a default and failure to cure by [First Financial] and Sadek...." (Tr. 73-74) Attorney Grossman testified that he questioned First Financial's motivations, because if they were current on their obligations, no judgment would be entered. (Tr. 77-78).

*4 Attorney Lipman testified instead that he never agreed to use the mechanism of a judgment against the two defendants with attorney's fees (Tr. 137). He testified that he did not recall the "specific mechanism" to enforce a judgment, but "[o]nly the concept of a simplified mechanism" (Tr. 153). He further testified that at the mediation, there was no discussion as to which defendant would pay New Horizon, only that New Horizon would be paid, and characterized the "default and personal liability [terms as coming] out of left field." (Tr. 135). He conceded that at some point, he and Attorney Grossman discussed the question of interest, but he did not recall whether this conversation took place during or after the mediation. (Tr. 131, 138). He described the issue of personal liability as the primary one on which the parties could not agree. (Tr. 158). He further testified that because he added the opportunity for defendants to cure a default, there was no need to create a new cause of action for enforcement of the settlement, so that ¶ 20 was unnecessary. (Tr. 137-39).

Attorney Grossman's draft of ¶ 9 allowed "the Court to retain jurisdiction to enforce the terms and conditions of the Settlement Agreement," which language was eliminated by Attorney Lipman in his marked up version. Similarly, the last sentence of Attorney Grossman's draft of ¶ 15 stated: "Should

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

any disagreement occur and should it be necessary to enforce this Agreement, the appropriate venue shall be in Connecticut." This sentence similarly was eliminated by Attorney Lipman in his marked up version. Using a biblical expression, Attorney Grossman described this cross-out "like a sign post on the door," because there was "no good faith reason" for it (Tr. 74-75, 78). Attorney Grossman indicated to Attorney Lipman that his clients did not want to be "haul[ed] ... [in]to New Jersey" by First Financial. (Tr. 75). Attorney Lipman testified that he thought it was "unusual" to have venue remain in Connecticut, because his clients were located in New Jersey. (Tr. 154-55). Attorney Lipman indicated that if all the other issues had been resolved, he might have "caved" on the issue of venue. (Tr. 158).

## II. DISCUSSION

In order to reach a valid settlement agreement, the parties must voluntarily enter into the agreement and the parties must mutually assent to the terms and conditions of the agreement. *Millgard Corp. v. White Oak Corp.*, 224 F.Supp.2d 425, 432 (D.Conn.2002) (citation omitted); *Brown v. Nationscredit Commercial*, 2000 U.S. Dist LEXIS 9153, at *6 (D. Conn. June 23, 2000) (citations omitted), *see also Johnson v. Schmitz*, 2002 WL 31863520, at *4-5 (D.Conn. Dec.19, 2002)(multiple citations omitted). However, once reached, a settlement agreement constitutes a contract that is binding and conclusive and the parties are bound to the terms of the contract even if it is an oral agreement and even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing. *Pultney Arms, LLC v. Shaw Industries, Inc.*, 2002 WL 31094971, at * 2 (D.Conn. Sept.6, 2002); *Johnson*, 2002 WL 31863520, at *4; *Brown*, 2000 U.S. Dist. LEXIS 9153, at *5-6. Moreover, once a settlement is reached, the "clear and unambiguous terms of the agreement" are not subject to repudiation by the parties; rather, the agreement will be summarily enforced by the court. *Brown*, 2000 U.S. Dist. LEXIS, at *6; *Audubon Parking Assocs. Ltd. P'ship v. Barclay & Stubbs, Inc.*, 225 Conn. 804, 812, 626 A.2d 729, 733 (1993). "Summary enforcement is not only essential to the efficient use of judicial resources, but also preserves the integrity of settlement in a meaningful way to resolve legal disputes." *Audubon*. 225 Conn. at 811, 626 A.2d 729 As Judge Newman, writing for the majority of the Second Circuit, noted

*5 Due regard for the proper use of judicial resources requires that a trial judge proceed with entry of a settlement judgment after affording the parties an opportunity to be heard as to the precise content and wording of the judgment, rather than resume the trial and precipitate an additional lawsuit for breach of a settlement agreement This authority should normally be exercised whenever settlements are announced in the midst of trial.

*Janus Films, Inc. v. Miller*, 801 F.2d 578 583 (2d Cir.1986).

Based on the testimony of the attorneys and parties involved and of Judge Zampano it is clear to this Court that a settlement agreement was reached on February 6, 2002. There was no discussion or provision that the agreement would not be binding unless or until it was in writing. Thus, although oral, a binding contract was formed on that date. *See Pultney Arms*, 2002 WL 31094971, at *2; *Johnson*, 2002 WL 31863520, at *4; *Brown*, 2000 U.S. Dist. LEXIS 9153, at *5-6.

Defendants, consisting of First Financial and Sadek, agreed that they would pay New Horizon an aggregate sum of $190,000.00 over a period of twelve months commencing on March 1, 2002 and continuing consecutively until February 3, 2003, and that First Financial would release any claim to, and surrender physical possession of the Variable Universal Life Insurance Policy on the life of Linda Rezak. There is no dispute that both sides agreed upon those two terms, yet defendants have not made one single payment (even to be held in escrow), when by this time, the full amount was due. Attorney Lipman conceded that he and Attorney Grossman at some point had discussed the question of interest.

With regard to the issue of Sadek's liability and the imposition of a judgment upon default, an examination of defense counsel's changes to the draft agreement reflects a change of heart rather than plaintiffs' inclusion of terms not agreed upon by defendants, and as Attorney Grossman testified. Attorney Lipman's modifications to ¶ 6 are internally inconsistent with ¶¶ 2 and 3, and other provisions within ¶ 6. Judge Zampano testified that if a settlement singled out a corporate defendant to the exclusion of an individual defendant, he would have included that in his notes.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

With regard to the two other remaining issues there would be no incentive for New Horizon to settle this case if First Financial and Sadek retained their defenses to any claims asserted against them by New Horizon, and contrary to Attorney Lipman's perceptions, it is not at all "unusual" to have venue remain in this district for enforcement of the settlement, as is the case right now.

Therefore, plaintiff's Motion for Summary Enforcement of Settlement Agreement (Dkt.# 79) is *granted*, as agreed upon by the parties in Exhibit 5 with the following modifications: (1) ¶ 5 shall be included; (2) ¶ 6 shall include the words "and Sadek, jointly and severally" in the second and third lines; (3) ¶ 9 shall include New Horizon's language, not First Financial's revision (unless otherwise agreed to by counsel); and (4) ¶ 15 shall include both sentences. [FN10]

> FN10. Paragraph 20 is not included, in that it is duplicative of other paragraphs.

### III. CONCLUSION

*6 Accordingly, for the reasons stated above, plaintiffs' Motion for Summary Enforcement of Settlement Agreement (Dkt.# 79) is *granted* [FN11]

> FN11. As previously indicated, First Financial should have completed payments on or before February 3, 2003. If defendants do not pay New Horizon the full $190,000 *on or before April 28, 2003*, New Horizon may seek its remedies under ¶ 6 of the Settlement Agreement.
> In addition, New Horizon may file a motion for attorney's fees and costs, with supporting documentation, *on or April 28, 2003*, bearing in mind, however, the matters raised in n. 9 *supra*.

See 28 U.S.C. § 636(b)(written objections to ruling must be filed within ten days after service of same); Fed. R. Civ. P. 6(a), 6(e) & 72. Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Small v. Secretary, H & HS*, 892 F.2d 15, 16 (2d Cir.1989)(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).

2003 WL 22004255 (D.Conn.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2003 WL 1090702 (Conn.Super.))

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Tolland.

Robert PITRUZELLO et al.,
v.
Anthony L. MURO, Jr.

No. X07CV000072168S.

Feb. 27, 2003.

Bonee Law Offices, Hartford, for Robert Pitruzzello and Virginia Pitruzzello.

Cramer Alissi & Fontaine P.C., Hartford, for Anthony Muro.

Brown Raysman & Millstein, Hartford, for Pensco Pension Services.

SFERRAZZA, J.

*1 The defendant, Anthony Muro, Jr., moves to enforce summarily a putative settlement agreement he purportedly entered into with the plaintiffs, Robert and Virginia Pitruzello, in the case of *Pitruzello v. Muro,* Superior Court, Complex Litigation Docket, Tolland J.D., X07-CV00-0072168. On February 4, 2003, the court held an evidentiary hearing pursuant to the holding of *Audubon Parking Associates LTD Partnership v. Barclay & Stubbs, Inc.,* 225 Conn. 804 (1993), and finds the following facts.

On January 9, 2000, the plaintiffs commenced this action alleging professional negligence on the part of the defendant. On December 18, 2000, the plaintiffs amended their complaint to add a count alleging violation of the Connecticut Unfair Insurance Practices Act (CUIPA) and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 38a-813 and 41-110b, respectively. The essence of these allegations is that the defendant advised and convinced the plaintiffs to surrender relatively safe investments in insurance annuities and to reinvest the proceeds in promissory notes which obligations turned out to be part of pyramid schemes resulting in the loss of those proceeds.

Two other sets of plaintiffs also sued the defendant based on similar claims, and a joint jury trial of the three cases was scheduled to begin evidence on Monday, January 27, 2003. Jury selection, the marking of exhibits, and the resolution of pretrial evidentiary motions had concluded on the preceding Friday, January 24, 2003.

In addition, the defendant's insurer had also filed a declaratory judgment action requesting that the court determine whether the insurer has any obligation to provide coverage in the event the defendant was found liable in any of the three previously described cases.

Attorney John Bonee, III, represented the Pitruzellos from commencement of suit until the *Audubon* hearing on February 4, 2003. Sometime in December 2002, the defendant's counsel, Attorney Mark Cramer, phoned Bonee and discussed possible resolution of the litigation short of trial. After conferring with his clients, Bonee informed Cramer that the defendant's offer of settlement was rejected by the plaintiffs.

On Saturday, January 25, 2003, Cramer and counsel for the plaintiffs in the other two cases reached an agreement which settled their cases against the defendant, which settlement included a withdrawal of the matters. During the morning of Sunday, January 26, 2003, Bonee, who was at his office preparing for the imminent trial, received a phone call from the other plaintiffs' lawyer who informed Bonee that the companion cases were resolved and would be withdrawn. Bonee

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

recognized that this development meant that his clients would now have to bear the entire brunt of the cost of trial, including expert witness fees, as well as other negative consequences which would flow from having the sole case against the defendant.

Bonee immediately phoned his clients at around 10:00 a.m. on that date. Virginia Pitruzello received the call and spoke briefly to Bonee. He explained the change in circumstances and suggested that the Pitruzellos revive settlement negotiations. Robert Pitruzello was at work at the time, and his wife wanted her husband to participate in any settlement discussion with Bonee. She asked Bonee to call back at around noon. In the interim, she phoned her husband, and he returned home at about 11:30 am.

*2 Meanwhile, Bonee called Cramer, who was also at his office preparing the defense for the remaining case which was to begin evidence the next day, to inquire if a settlement might still be attained. After some discussion Cramer indicated that he would recommend to the defendant that he accept a proposed resolution, but he would need to consult with counsel and a representative of the insurer to ascertain whether the proposal was acceptable to the insurer because the terms of the proposed settlement involved certain concessions and actions on the part of the defendant's insurer as well as the defendant. The proposed disposition included a provision for potential interest which was lacking in the offer of settlement which the plaintiffs had rejected in December 2002.

After the negotiations, Bonee called the plaintiffs again around noon and spoke to Robert Pitruzello. Bonee fully explained the latest proposal which, as noted above, added a method for calculating certain interest. The plaintiffs, through Robert Pitruzello, told Bonee that, if he could not obtain further concessions, the proposed settlement was acceptable to them. Bonee predicted that it was very unlikely that any more concessions would be forthcoming, but he would contact Cramer to explore that possibility. Significantly, Bonee also requested that the plaintiffs authorize him to settle the case on the presently proposed terms if the defendant was unwilling to grant more favorable ones. The plaintiffs, through Robert Pitruzello, expressly granted to Bonee the authority to settle the matter in this fashion.

The court finds that, at the time of this authorization, both plaintiffs were aware of each and every provision of the proposed settlement. The court further finds that there is no dispute as to the content of the proposed agreement and that the terms are clear and unambiguous.

At the *Audubon* hearing, the only controversy concerned whether the plaintiffs authorized Bonee to accept the proposal on their behalf without further consultation with them. Although the testimony on this point was in conflict, the court finds that Bonee was expressly authorized to settle the case on the proposed terms without subsequent discussions or confirmation by the plaintiffs.

It must be observed that the settlement offer contained a confidentiality provision. Because of that provision, which would be lost if the terms of the settlement were disclosed publicly, under the authority of Practice Book § 11-20(f), the court has previously sealed the records with respect to the actual putative agreement, which is sealed exhibit C to the Defendant's January 30, 2003 Motion to Enforce the Settlement Agreement.

Later in the afternoon of January 26, 2003, Bonee contacted Cramer. After Cramer rejected any further concessions, Bonee, acting as the agent of the plaintiffs, accepted the proposed settlement. Both attorneys agreed that, based on the accord reached, they would cease trial preparation and report to the court the next day that the case had settled. Because Bonee had explained what was to occur in his earlier conversation with Robert Pitruzello, he saw no need to call the plaintiffs a third time to reiterate that the case was resolved. It should be noted that January 26, 2003, was "Super Bowl Sunday." Bonee and the Pitruzellos were both entertaining guests at their respective homes for that occasion. Each knew of the others' plans.

*3 Sometime later that day, the Pitruzellos retrieved copies of the pleadings in the declaratory judgment action which had been furnished to them previously. After perusing these documents, the plaintiffs had second thoughts about settling the case. At 7 a.m. on Monday, January 27, 2003, Virginia Pitruzello left a message on Bonee's office voicemail to that effect.

That morning, however, Bonee went to court without checking his office voicemail. He arrived at

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the courthouse around 9:30 a.m. and found that his clients had arrived earlier. The plaintiffs explained their change of heart regarding settlement and their wish to proceed with the trial.

Court convened shortly thereafter, and Attorney Cramer reported to the court that all three cases had settled. Counsel for the other plaintiffs filed withdrawals as to their two cases. Bonee communicated to the court that although a settlement has been achieved, his clients had changed their minds and wished to continue with the jury trial. Cramer objected, and the court scheduled the *Audubon* hearing.

The parties agree that a trial court has the inherent power to enforce summarily a clear and unambiguous settlement. *Audubon Parking Assoc. Ltd Partnership v. Barclay & Stubbs, Inc., supra.* There is no requirement that the settlement be in writing or signed by the parties. *Sicaras v. Hartford,* 44 Conn.App. 771, 777 (1997). Nor must the agreement be reported to the court or otherwise placed on record. *DAP Fin. Mgmt. Co. v. MOR-FAM Electric, Inc.,* 59 Conn.App. 92 (2000), *Montgomery v. Smith,* 40 Conn.Sup. 358, 359 (1985).

What is necessary is that there be an agreement. *DAP Fin. Mgmt Co. v. MOR- FAM Electric, Inc., supra,* at 97. Simply because an attorney represents a party in a matter does not mean that the attorney has the authority to settle the matter without the consent of that party. *Cole v. Myers,* 128 Conn. 223, 228 (1941). However, where the client conveys authority to settle upon definite terms to the client's lawyer, the settlement reached upon these terms binds the client. *Maharishi School of Vedic Sciences v. Conn. Constitution A.L.P.,* 260 Conn. 598, 605 (2002).

In this case, the court has found that on January 26, 2003 Robert Pitruzello, with the knowledge of his wife, expressly authorized Bonee to accept the defendant's proposed offer of settlement on their behalf rather than proceed to trial without the other plaintiffs who had already settled their cases. The fact that the plaintiffs had second thoughts, after this authorization was conveyed and after Bonee and Cramer reached the accord permitted under the authorization, is immaterial. The critical time for analyzing whether an authorized settlement has been achieved is at the moment of settlement, not at the time the trial was to have begun. *DAP Fin. Mgmt. Co. v. MOR-FAM Electric Inc., supra.*

Bonee had actual authority to settle the case on the unambiguous terms of the agreement which he fully explained to his clients before that authority was expressly conferred. Thus, the plaintiffs are bound by the settlement which he negotiated with defense counsel on January 26, 2003. *Maharishi School of Vedic Sciences v. Conn. Constitution A.L.P., supra,* at 606. Reconsideration and regret are insufficient to loosen the plaintiffs from the binding effect of the settlement to which Bonee agreed. *Montgomery v. Smith, supra; Finley Assoc. v. Crossroads Inc.,* Superior Court, Complex Litigation Docket, New Britain Judicial District, d.n. X03-CV99-499388 (December 17, 2001) (Aurigemma, J.).

*4 Consequently, the court will summarily enforce the agreement by dismissing the action if not withdrawn by March 21, 2003.

2003 WL 1090702 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works